CV 08    4080

JSW

# EXHIBIT "G"

(PR)

Appendix G

# STATE OF CALIFORNIA

# OFFICE OF ADMINISTRATIVE LAW  2008 AUG 15  AM 10: 46

### 2008 OAL DETERMINATION NO. 19
### (OAL FILE # CTU 2008-0129-01)

**REQUESTED BY:  Michael St. Martin**

**CONCERNING:      Department of Mental Health**

### DETERMINATION ISSUED PURSUANT TO
### GOVERNMENT CODE SECTION 11340.5.

### SCOPE OF REVIEW

A determination by the Office of Administrative Law (OAL) evaluates whether or not an action or enactment by a state agency complies with California administrative law governing how state agencies adopt regulations. Nothing in this analysis evaluates the advisability or the wisdom of the underlying action or enactment. Our review is limited to the sole issue of whether the challenged rule meets the definition of a "regulation" as defined in Government Code section 11342.600[1] and is subject to the Administrative Procedure Act (APA). If a rule meets the definition of a "regulation," but was not adopted pursuant to the APA and should have been, it is an "underground regulation" as defined in California Code of Regulations, title 1, section 250. OAL has neither the legal authority nor the technical expertise to evaluate the underlying policy issues involved in the subject of this determination.

### ISSUE

On January 29, 2008, Mr. St. Martin (Petitioner) submitted a petition to OAL challenging the Clinical Evaluator Handbook and Standardized Assessment Protocol (2007) (Protocol)[2] issued by the Department of Mental Health (DMH) as an underground regulation[3] allegedly in violation of Government Code section 11340.5. California Code

---

[1] Section 11342.600 defines regulation as:

...every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of any rule, regulation, order, or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure.

[2] The terms "Protocol" and "Handbook" are used interchangeably throughout the Protocol, the comments received from the public, the Department of Health's response, and the Petitioner's rebuttal. We will use the term "Protocol" but the term "Handbook" may also be used when quoting from these documents.

[3] An underground regulation is defined in title 1, California Code of Regulations, section 250:

"Underground regulation" means any guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule, including a rule governing a state agency procedure, that is a regulation as defined in Section 11342.600 of the Government Code, but has not been adopted as a regulation

of Regulations, title 1, section 260(a)(3) requires that if the purported underground regulation is found in an agency manual, the petition shall identify the specific provision of the manual alleged to comprise the underground regulation. The petition included a list of ten provisions which contain the alleged underground regulation. This determination is limited to the following provisions specified in the petition:

1. Page 2, section titled "Evaluator Panel": "Evaluators are required to interview and evaluate persons in accordance with the protocol contained within this handbook...."

2. Page 2, section titled "Standardized Assessment Protocol": "This handbook and all supplemental instructions to DMH staff and contractors in the implementation of the [Sexually Violent Predator] law is the required standardized assessment protocol."

3. Page 4, section titled "Special requests from Courts & Attorneys": "DMH expects that evaluators will notify the SOCP [Sex Offender Commitment Program] Unit in Sacramento of all Court Orders and Attorney Requests that do not conform to the policies and procedures. DMH will then direct the evaluator in his/her response to such orders/requests."

4. Pages 9-11, section titled "The Clinical Interview": This section instructs the evaluator how to conduct the interview.

5. Page 9, section titled "Beginning the SOCP Evaluation": "In 'update' or 'replacement interview,' the court may issue an order that the evaluation be tape recorded, and/or an attorney be allowed to be present. The evaluator should comply with that order...."

6. Page 11, section titled "Historical Information": "Reliable history and prior clinical evaluations from the inmate's records should be used to provide a basis for decision making in [Sexually Violent Predator] evaluation."

7. Page 14, section titled "Subpoenas & Depositions": "If you receive such a subpoena, notify DMH who will advise you how to proceed."

8. Page 20, section titled "Psychological Testing": "While evaluators may organize their risk assessment in their own unique way, they must rely on the guidelines of this protocol and include the following elements of risk assessment."

9. Pages 16-32, section titled "SOCP Clinical Evaluation Protocol (Annotated)": this section contains detailed mandatory instructions in every facet of the clinical evaluation.

10. Page 35, section titled "[Sexually Violent Predator] Commitment Extension Evaluations": "Since the person has been committed as [a Sexually Violent Predator] by the court for 'appropriate treatment' (Welf. & Inst. Code § 6604), the department believes that a person must finish the program, including the completion of a period of outpatient supervision...."

---

and filed with the Secretary of State pursuant to the APA and is not subject to an express statutory exemption from adoption pursuant to the APA.

## DETERMINATION

OAL determines that the challenged language in the Protocol contains provisions that meet the definition of a "regulation" as defined in section 11342.600 and that those provisions should have been adopted pursuant to the APA. As noted in the response submitted by DMH, other provisions in the Protocol, which were not challenged in the petition, contain restatements of law and are not required to be adopted pursuant to the APA.

## FACTUAL BACKGROUND

On January 1, 1996, the California Sexually Violent Predator (SVP) law[4] became effective. The SVP law provides a process by which a current inmate of Department of Corrections and Rehabilitation (CDCR) can be civilly committed as a sexually violent predator and thereby becoming a patient of DMH.[5]

Pursuant to Welfare and Institutions Code section 6601, the Secretary of CDCR may determine, within six months prior to an inmate's scheduled release date, that an inmate is a sexually violent predator as defined in Welfare and Institutions Code section 6600. If the Secretary of CDCR makes such a determination, the inmate is referred to DMH for evaluation, pursuant to "a standardized assessment protocol, developed and updated by the State Department of Mental Health.[6]"

Welfare and Institutions Code 6601 establishes the following procedure to be used if the inmate is determined by DMH to be a sexually violent predator. DMH may initiate a petition in the court in the county in which the person was convicted to have the inmate civilly committed to a state hospital. A judge in the superior court of that county must hold a probable cause hearing. If the judge finds there is no probable cause to find that the inmate is a sexually violent predator, the inmate is returned to CDCR for parole. If the judge finds that there is probable cause to find that the inmate is a sexually violent predator, the inmate is detained in a secure facility until a jury trial can be held. The civil commitment is reviewed at least once per year. If, after this independent review, DMH determines that the individual's diagnosed mental disorder has so changed that he or she is not likely to commit future acts of sexual violence, the civil commitment is terminated.

The Protocol, as revised in 2007, was issued by DMH and contains the procedures and protocols to be used by the independent evaluators. Welfare and Institutions Code section 6601(c) requires that a person referred from CDCR be evaluated in accordance

---

[4] Welfare and Institutions Code section 6600 and following.

[5] A person who has been referred by CDCR to DMH for evaluation as an SVP is an "inmate" of CDCR. If that person is determined to be an SVP, he or she is transferred to a state hospital under the jurisdiction of DMH and is no longer an inmate of a CDCR prison. The SVP is then referred to as a "patient" or "individual."

[6] Welfare and Institutions Code section 6601(c).

with a standardized assessment protocol, developed and updated by DMH. The Protocol is the standardized assessment protocol required by section 6601(c).[7]

The Petitioner challenged the entire Protocol as an underground regulation and gave specific examples of provisions that were alleged underground regulations. Pursuant to California Code of Regulations, title 1, section 260(b)(3), OAL's acceptance of the petition was limited to the examples listed in the petition. This determination is limited to those examples listed above, except when it is necessary to discuss additional provisions cited in DMH's response.

On June 2, 2008, OAL received a response to the petition from DMH. We will address each argument in the Agency Response section below. DMH asserts:

1.  The Protocol is not a regulation. "Instead, it is a guide and a uniform format to be used by clinical evaluators, psychologists and psychiatrists, to make case-specific determination using their education, experience, and expertise to form and report their opinion, in the exercise of their independent professional clinical judgment."[8]
2.  The Protocol is not applied generally. The Protocol "does not declare how a certain class of cases will be decided. While the Protocol provides elements for evaluators to follow or look for, evaluators are asked to make a determination based on their own unique knowledge, experience, and personal assessment.... Two evaluators could evaluate the same patient, following the same elements set forth in the Protocol and still reach different conclusion."[9]
3.  "The evaluations performed with the Protocol and resulting reports are clinical evaluations, necessarily requiring the exercise of specialized, professional clinical judgment.... Since the available studies and literature are constantly being augmented, the clinical standards of the professions of psychology and psychiatry evolve over time, the DMH does not have authority to dictate or control the standards or clinical profession of psychology or psychiatry."[10]
4.  "The Protocol leaves the professional evaluation process in the hands of the evaluator. For example, it does not limit the factors the evaluator may consider in reaching an evaluation outcome.... [T]he Protocol expressly states that the evaluator, not the Protocol, will determine the evaluation's outcome."[11]
5.  "The Protocol is not quasi-legislative. The Protocol sets forth a format for the professionals to use for court reports. ... [I]t does not tell the evaluator what determination to make.... While the format for the court report is intended to apply generally to all SVP reports, the format of the report in no way dictates the opinion of the evaluator."[12]

---

[7] Page 2 of the Protocol, section titled "Standardized Assessment Protocol"

[8] Page 3 of the response.

[9] Page 3 of the response.

[10] Page 5 of the response.

[11] Page 6 of the response.

[12] Page 6 of the response.

6.  Specified provisions of the Protocol are restatements of the Welfare and
    Institutions Code.[13]

OAL received several comments from the public. The majority of the comments were
from different regional offices of Protection and Advocacy, Inc. The comments
uniformly expressed agreement with the arguments in the petition and support a finding
that the challenged provisions in the Protocol meet the definition of a regulation. The
commenters emphasized that evaluators are required to follow the Protocol and are not
permitted to perform the evaluations in any manner not found in the Protocol.

On June 17, 2008, OAL received the Petitioner's rebuttal to DMH's response to the
petition. The rebuttal reiterates the arguments made in the petition and disagrees with the
arguments made in DMH's response.

## UNDERGROUND REGULATIONS

Section 11340.5, subdivision (a), prohibits state agencies from issuing rules unless the
rules comply with the APA. It states as follows:

> (a) No state agency shall issue, utilize, enforce, or attempt to
> enforce any guideline, criterion, bulletin, manual, instruction,
> order, standard of general application, or other rule, which is a
> regulation as defined in [Government Code] Section 11342.600,
> unless the guideline, criterion, bulletin, manual, instruction, order,
> standard of general application, or other rule has been adopted as a
> regulation and filed with the Secretary of State pursuant to [the
> APA].

When an agency issues, utilizes, enforces, or attempts to enforce a rule in violation of
section 11340.5 it creates an underground regulation as defined in title 1, California Code
of Regulations, section 250.

OAL may issue a determination as to whether or not an agency issued, utilized, enforced,
or attempted to enforce a rule that meets the definition of a "regulation" as defined in
section 11342.600 that should have been adopted pursuant to the APA. OAL's
determination that an underground regulation was created is not enforceable against the
agency through any formal administrative means, but it is entitled to "due deference" in
any subsequent litigation of the issue pursuant to *Grier v. Kizer* (1990) 219 Cal.App.3d
422, 268 Cal.Rptr. 244.

## ANALYSIS

A determination of whether the challenged rule is a "regulation" subject to the APA
depends on (1) whether the challenged rule meets the definition of a "regulation" within

---

[13] Page 7 of the response.

the meaning of section 11342.600, and (2) whether the challenged rule falls within any recognized exemption from APA requirements.

A regulation is defined in section 11342.600 as:

> ... every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of any rule, regulation, order, or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure.

In *Tidewater Marine Western, Inc. v. Victoria Bradshaw* (1996) 14 Cal.4th 557, 571, the California Supreme Court found that:

> A regulation subject to the Administrative Procedure Act (APA) (Gov. Code, §11340 et seq.) has two principal identifying characteristics. First, the agency must intend its rule to apply generally, rather than in a specific case. The rule need not, however, apply universally; a rule applies generally so long as it declares how a certain class of cases will be decided. Second, the rule must implement, interpret, or make specific the law enforced or administered by the agency, or govern the agency's procedure (Gov. Code, § 11342, subd. (g)).

The first element of a regulation is whether the rule applies generally. As *Tidewater* pointed out, a rule need not apply to all persons in the state of California. It is sufficient if the rule applies to a clearly defined class of persons or situations. We will look at each of the challenged provisions in turn to determine if it applies to a clearly defined class of persons or situations:

1. Page 2, section titled "Evaluator Panel": "Evaluators are required to interview and evaluate persons in accordance with the protocol contained within this handbook..."

This provision applies to all evaluators. Evaluators are a clearly defined class of persons. Additionally, the provision applies to all CDCR inmates referred to DMH for evaluation pursuant to the SVP law because it mandates how the evaluation is to be conducted. Both evaluators and inmates are clearly defined classes; therefore, the first element of *Tidewater* is met for this provision.

2. Page 2, section titled "Standardized Assessment Protocol": "This handbook and all supplemental instructions to DMH staff and contractors in the implementation of the SVP law is the required standardized assessment protocol."

6

As with challenged provision 1, the requirement for DMH staff and contractors to use the Protocol in implementing the SVP law applies to evaluators, DMH staff and the inmates being evaluated. These are clearly defined classes; therefore, the first element of *Tidewater* is met for this provision.

3. Page 4, section titled "Special requests from Courts & Attorneys": "DMH expects that evaluators will notify the SOCP [Sex Offender Commitment Program] Unit in Sacramento of all Court Orders and Attorney Requests that do not conform to the policies and procedures. DMH will then direct the evaluator in his/her response to such orders/requests."

This requirement applies to evaluators, DMH staff and the inmates being evaluated. These are clearly defined classes; therefore, the first element of *Tidewater* is met for this provision.

4. Pages 9-11, section titled "The Clinical Interview": This section instructs the evaluator how to conduct the interview and includes the information the evaluator must give to the inmate. For example:
   a. The evaluator should begin by describing the interview process
   b. The inmate should be asked to sign a form providing information about Welfare and Institutions Code section 6600, the SVP law.
   c. The evaluator should comply with a court order to tape record an "update" or "replacement" interview.
   d. The section acknowledges that there are various approaches to interviewing sex offenders and the approach and structure of the interview is made by the evaluator. The Protocol specifies the questions that must be answered and the formats to be used.

This requirement applies to evaluators and also to the inmates being evaluated. These are clearly defined classes; therefore, the first element of *Tidewater* is met for this provision.

5. Page 9, section titled "Beginning the SOCP Evaluation": "In 'update' or 'replacement interview,' the court may issue an order that the evaluation be tape recorded, and/or an attorney be allowed to be present. The evaluator should comply with that order...."

This provision is part of challenged provision 4, above. This requirement applies to evaluators and also to the inmates being evaluated. These are clearly defined classes; therefore, the first element of *Tidewater* is met for this provision.

6. Page 11, section titled "Historical Information": "Reliable history and prior clinical evaluations from the inmate's records should be used to provide a basis for decision making in SVP evaluation."

This requirement applies to evaluators and also to the inmates being evaluated.    These
are clearly defined classes; therefore, the first element of *Tidewater* is met for this
provision.

7.  Page 14, section titled "Subpoenas & Depositions": "If you receive such a
    subpoena, notify DMH who will advise you how to proceed."

This requirement applies to evaluators.  This is a clearly defined class; therefore, the first
element of *Tidewater* is met for this provision.

8.  Page 20, section titled "Psychological Testing": "While evaluators may organize
    their risk assessment in their own unique way, they must rely on the guidelines of
    this protocol and include the following elements of risk assessment."  The
    elements include approaches to risk assessment, actuarial risk assessment and
    adjusting an actuarial risk score.

This requirement applies to evaluators and also to the inmates being evaluated.  These are
clearly defined classes; therefore, the first element of *Tidewater* is met for this provision.

9.  Pages 16-32, section titled "SOCP Clinical Evaluation Protocol (Annotated)":
    this section contains detailed mandatory instructions in every facet of the clinical
    evaluation.  For example,
    a.  The evaluator must include specific identifying information;
    b.  The evaluation must contain answers to specific questions such as:
        i.  Has the inmate been convicted of a sexually violent criminal
            offense specified in WIC 6600 against one or more victims.  This
            question includes a discussion of what information must be
            included (the use of force, violence, etc., any prior determinations
            that the inmate was a Mentally Disordered Sex Offender, etc.)
            Requirements for how the information should be presented in the
            evaluation are also included;
        ii. Does the inmate have a diagnosed mental disorder that predisposes
            the person to the commission of criminal sexual acts?  This
            question is followed by a detailed discussion of the "diagnosed
            mental disorder" and how that diagnosis is arrived at.

The requirements in this section apply to evaluators and also to the inmates being
evaluated.  These are clearly defined classes; therefore, the first element of *Tidewater* is
met for this provision.

10. Page 35, section titled "SVP Commitment Extension Evaluations": "Since the
    person has been committed as an SVP by the court for 'appropriate treatment'
    (Welf. & Inst. Code § 6604), the department believes that a person must finish the
    program, including the completion of a period of outpatient supervision. Only
    under unusual circumstances would a patient being evaluated for SVP
    commitment extension be deemed unlikely to commit future sexually violent acts

as a result of a mental disorder, if all five phases of treatment have not been
completed. If this is the case, the evaluator is required to consult with the
Department on their conclusion."

The requirements in this section apply to evaluators and also to the inmates being
evaluated. These are clearly defined classes; therefore, the first element of *Tidewater* is
met for this provision.

The first element of *Tidewater* is, therefore, met for all the challenged provisions in the
Protocol.

The second element of *Tidewater* is that the rule must implement, interpret or make
specific the law enforced or administered by the agency, or govern the agency's
procedure. The SVP law requires inmates who are referred by CDCR to DMH as
possible sexually violent predators to be evaluated by DMH. Pursuant to Welfare and
Institutions Code section 6601(c) and (d), DMH must evaluate the person in accordance
with a standardized assessment protocol, developed and updated by DMH to determine
whether the person is a sexually violent predator. The standardized assessment protocol
must require assessment of diagnosable mental disorders, as well as various factors
known to be associated with the risk of reoffense among sex offenders. The risk factors
which must be considered include criminal and psychosexual history, type, degree, and
duration of sexual deviation and severity of mental disorder. The evaluation must be
made by two practicing psychiatrists or psychologists, or one practicing psychiatrist and
one practicing psychologist designated by DMH.[14]

On page 2 of the Protocol, DMH states:

[Welfare and Institutions Code] Section 6601(c) requires that a person
referred from CDCR be evaluated in accordance with a standardized
assessment protocol, developed and updated by the DMH. This clinical
evaluator handbook is the centerpiece of that protocol. This handbook
may be supplemented by additional instructions to clinical evaluators as
necessary. *This handbook and all supplemental instructions to DMH staff
and contractors in the implementation of the SVP law is the required
standardized assessment protocol.* (Emphasis added.)

The challenged provisions of the Protocol contain detailed requirements the evaluator
must use to make the risk assessment required by Welfare and Institutions Code section
6601(c). For example, the challenged provisions require that the evaluator ask specific
questions of the inmate, that the evaluator notify DMH of requests from the court or
attorneys, and that the clinical interview provide specific information to the inmate. The
Protocol itself states that it implements the SVP law which is enforced or administered by
DMH.[15] Hence, the challenged provisions of the Protocol implement or make specific
the SVP law or govern DMH's procedures implementing the SVP law.

---

[14] Welfare and Institutions Code section 6601(c) and (d).

[15] Page 2 of the response.

The second element in *Tidewater* is therefore met.

Finding that both elements of *Tidewater* have been met, OAL concludes that the challenged provisions of the Protocol meet the definition of a "regulation" as defined in section 11342.600.

The final issue to examine is whether the challenged provisions of the Protocol fall within an exemption from the APA. Exemptions from the APA can be general exemptions that apply to all state rulemaking agencies.[16] Exemptions may also be specific to a particular rulemaking agency or a specific program. Pursuant to section 11346, the procedural requirements established in the APA "shall not be superseded or modified by any subsequent legislation except to the extent that the legislation shall do so expressly."

We find no APA exemptions that would apply to the Protocol. DMH has not identified any express exemption from the APA that would include the Protocol.

As noted in DMH's response to the petition, some provisions in the Protocol, which were not challenged in the petition, are restatements of existing law. A restatement is not an exemption from the APA; rather, it repeats the law and does not further implement, interpret or make specific any provision of law. A restatement does not need to be adopted pursuant to the APA. Examples of restatements in the Protocol are:

1. Appendix A restates Welfare and Institutions Code section 6600 and the following sections in their entirety.
2. The Introduction includes a summarization of the requirements of the SVP law without further implementing, interpreting or making specific the SVP law.
3. The section titled "Evaluator Liability" on page 2 restates Penal Code section 1618.
4. The section titled "Definitions Relevant to SOCP" on page 6 contains a list of definitions restated from various Penal Code sections.

Such restatements do not meet the definition of "regulation" and are, therefore, not required to be adopted pursuant to the APA.[17]

## AGENCY RESPONSE

As noted above, in its response DMH makes several arguments. We will address each in turn.

---

[16] See Government Code section 11340.9.

[17] The definition of "regulation" in Government Code section 11342.600 means that the rule must "implement, interpret or make specific" the law enforced or administered by a state agency, or govern its procedure. A restatement of existing law is not an interpretation or implementation of that law.

1. The Protocol is not a regulation. "Instead, it is a guide and a uniform format to be used by clinical evaluators, psychologists and psychiatrists, to make case-specific determination using their education, experience, and expertise to form and report their opinion, in the exercise of their independent professional clinical judgment."[18]

We disagree with DMH's argument. A regulation is defined in Government Code section 11342.600 as:

>...every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of any rule, regulation, order, or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure.

The challenged sections of the Protocol establish standards every evaluator must follow. On page 11, the Protocol states

>While this Evaluator Handbook *specifies the questions that must be answered and formats to be used,* it does not address everything an evaluator may need to consider. (Emphasis added.)

While the Protocol may be characterized as a "guide and a uniform format," the Protocol, by its own terms, is a document which the evaluators must use.[19] It contains specific instructions to the evaluators on how to conduct an evaluation, the questions they must ask, how to submit their findings, etc. The Protocol states: "All evaluations are assigned, supervised, and submitted to SOCP Evaluation Unit in Sacramento in accordance with instructions contained in this handbook."[20] By imposing these requirements on evaluators, the Protocol meets the definition of "regulation."

2. The Protocol is not applied generally. The Protocol "does not declare how a certain class of cases will be decided. While the Protocol provides elements for evaluators to follow or look for, evaluators are asked to make a determination based on their own unique knowledge, experience, and personal assessment.... Two evaluators could evaluate the same patient, following the same elements set forth in the Protocol and still reach different conclusion."[21]

OAL disagrees with this argument. In its analysis of the first element of *Tidewater, supra,* OAL determined that the challenged provisions of the Protocol are rules of general application because they apply to the class of evaluators and/or inmates. The Protocol requires that evaluators to conduct the evaluations in a specific way by asking specific questions or making specific findings. The conclusion reached by an individual evaluator

---

[18] Page 3 of the response.
[19] Page 2 of the Protocol.
[20] Page 2 of the Protocol.
[21] Page 3 of the response.

may be based upon his or her "unique knowledge, experience, and personal assessment" but the standards to be used, the questions to be asked, and the conduct of the evaluation are mandated by the Protocol.

3. "The evaluations performed with the Protocol and resulting reports are clinical evaluations, necessarily requiring the exercise of specialized, professional clinical judgment....Since the available studies and literature are constantly being augmented, the clinical standards of the professions of psychology and psychiatry evolve over time, the DMH does not have authority to dictate or control the standards or clinical profession of psychology or psychiatry.[22]"

We agree that DMH does not have the authority to dictate or control the standards or clinical profession of psychology or psychiatry. However, the Protocol does mandate how the evaluation is conducted and how the results of the evaluation are presented. For example, on page 9 of the Protocol (in the challenged provision listed above as number 4), in the section titled "Drawing Clinical Conclusions," the Protocol states:

> Each evaluator should produce a report that represents his or her best judgment. Clearly state definitive opinions with a YES or NO answer to each clinical question are required. At times, the facts may be conflicting or incomplete, making an unequivocal clinical opinion impossible. If, after review of all the information available, you are unable to support an affirmative conclusion regarding a criterion, then that criterion has not been met and the answer is **NO**.

This is an example of language in the Protocol that requires the evaluation to be conducted in specified manner, that specific clinical questions be asked, and the submission of the result to be in a specified manner. The evaluator is required to adhere to these standards and procedures.

4. "The Protocol leaves the professional evaluation process in the hands of the evaluator. For example, it does not limit the factors the evaluator may consider in reaching an evaluation outcome.... [T]he Protocol expressly states that the evaluator, not the Protocol, will determine the evaluation's outcome.[23]"

We agree that the evaluation is based upon the evaluator's professional opinion; however, the procedures and requirements for the evaluation are contained in the Protocol. The evaluator is required to follow these procedures. The outcome of the evaluation may be the opinion of the evaluator, but that opinion is developed by complying with the required procedures and standards.

5. "The Protocol is not quasi-legislative. The Protocol sets forth a format for the professionals to use for court reports.... [I]t does not tell the evaluator what determination to make.... While the format for the court report is intended to

---

[22] Page 5 of the response.

[23] Page 6 of the response.

apply generally to all SVP reports, the format of the report in no way dictates the opinion of the evaluator.[24]"

The issue in this determination is not that compliance with the Protocol will result in a specific outcome. Rather the issue is whether the procedures and standards in the Protocol which all evaluators are required to use "implement, interpret, or make specific the law enforced by the agency; or govern the agency's procedure."[25]

As noted above, Welfare and Institutions Code section 6601(c) requires that a person referred from CDCR be evaluated in accordance with a standardized assessment protocol, developed and updated by DMH. The Protocol itself states that it is the required standardized assessment protocol.[26] The Protocol clearly implements, interprets, or makes specific the law enforced by the agency, or governs the agency's procedure.

  6. Specified provisions of the Protocol are restatements of the Welfare and Institutions Code.[27]

We agree that many provisions of the Protocol are restatements of the Welfare and Institutions Code. A restatement of law does not meet the definition of a "regulation" because it does not "implement, interpret, or make specific the law enforced by the agency; or govern the agency's procedure."[28] Restatements, then, are not required to be adopted as regulations pursuant to the APA. To the extent that the Protocol contains solely restatements of law, those provisions are not underground regulations.

## CONCLUSION

The challenged provisions in the "Clinical Evaluator Handbook and Standardized Assessment Protocol (2007)" issued by DMH meet the definition of a "regulation" as defined in section 11342.600 that should have been adopted pursuant to the APA. The Protocol also contains provisions that were not challenged in the petition that merely restate existing law, as noted in DMH's response. The restatements of law do not meet the definition of "regulation" and are not required to be adopted pursuant to the APA.

Date: August 15, 2008

Susan Lapsley
Director

Kathleen Eddy
Senior Staff Counsel

---

[24] Page 6 of the response.

[25] *Tidewater Marine Western, Inc. v. Victoria Bradshaw* (1996) 14 Cal.4th 557, 571.

[26] Page 2 of the Protocol, section titled "Standardized Assessment Protocol"

[27] Page 7 of DMH's response.

[28] *Tidewater Marine Western, Inc. v. Victoria Bradshaw* (1996) 14 Cal.4th 557, 571.

# EXHIBIT "H"

1  WAN J. KIM
   Assistant Attorney General
2  SHANETTA Y. CUTLAR (CA Bar No. 169849)
   Chief, Special Litigation Section
3  BENJAMIN O. TAYLOE, JR. (DC Bar No. 422910)
   LEE R. SELTMAN (CA Bar No. 168857)
4  MARY R. BOHAN (DC Bar No. 420628)
   WILLIAM G. MADDOX (DC Bar No. 000020540)
5  JACQUELINE CUNCANNAN (DC Bar No. 462985)
   MATTHEW J. DONNELLY (IL Bar No. 6281308)
6  ANITA C. SNYDER (NY Bar No. 3910494)
   Trial Attorneys
7  United States Department of Justice
   Civil Rights Division
8  Special Litigation Section
   950 Pennsylvania Avenue, N.W.
9  Washington D.C.  20035
   202) 514-6255
10
   DEBRA W. YANG
11 United States Attorney
   LEON W. WEIDMAN
12 Assistant United States Attorney
   Chief, Civil Division
13 GARY L. PLESSMAN
   Assistant United States Attorney
14 Chief, Civil Fraud Section
   HOWARD DANIELS (CA Bar No. 081764)
15 Assistant United States Attorney
   300 North Los Angeles Street
16 Federal Building, Room 7516
   Los Angeles, CA  90012
17 213) 894-4024

18 Attorneys for the United States of America

19               UNITED STATES DISTRICT COURT

20          FOR THE CENTRAL DISTRICT OF CALIFORNIA

21                    WESTERN DIVISION

22 UNITED STATES OF AMERICA,        )   CASE NO.
          Plaintiff,               )   CV  06-26617  GPS
23                                  )
          vs.                       )
24                                  )   CONSENT JUDGMENT
   STATE OF CALIFORNIA; THE         )
25 HONORABLE ARNOLD SCHWARZENEGGER, )
   Governor of the State of         )
26 California, in his official      )
   capacity only; STEPHEN W. MAYBERG, )
27 Director of the California       )
   Department of Mental Health, in  )
28 his official capacity only;      )

1 | SHARON SMITH NEVINS, Executive )
Director of Metropolitan )
2 | State Hospital, in her )
official capacity only; and DAVE )
3 | GRAZIANI, Executive Director of )
Napa State Hospital, in his )
4 | official capacity only, )
Defendants. )
5 | _____ )

6     Simultaneously herewith, Plaintiff, the United States of

7 America filed a Complaint under the provisions of 42 U.S.C.

8 § 1997 against the Defendants, seeking to remedy an alleged

9 pattern or practice of conduct that was alleged to deprive

10 patients of Metropolitan State Hospital, in Norwalk, California,

11 and Napa State Hospital, in Napa, California (collectively, and

12 including any facility that supplements or replaces them, the

13 "State Hospitals") of rights, privileges, and immunities secured

14 or protected by the Constitution or laws of the United States.

15 On the same date, the Parties in this matter filed a Stipulation

16 for Consent Judgment and Agreement ("Stipulation").

17     Noting the general principle that settlements are to be

18 encouraged, particularly settlements between governmental

19 entities, and having considered the Stipulation and the terms of

20 the measures, set forth herein, that the Defendants agree to

21 undertake to improve conditions at the State Hospitals, it is

22 ORDERED, ADJUDGED AND DECREED that pursuant to the Stipulation,

23 and good and reasonable cause appearing therefore, Judgment shall

24 be entered in this matter pursuant to the following terms and

25 conditions:

26

27

28

2

1                                **PART I**

2                            **ENHANCEMENT PLAN**

3  ----------------------------------------------------------------

4                            **Table of Contents**

5

6  A.   Definitions  . . . . . . . . . . . . . . . . . . . . .  - 5 -

7           1.   Effective Date . . . . . . . . . . . . . .  - 5 -

8           2.   Consistent With Generally Accepted Professional

9                Standards of Care  . . . . . . . . . . . . .  - 5 -

10  B.   Introduction . . . . . . . . . . . . . . . . . . . .  - 5 -

11  C.   Integrated Therapeutic and Rehabilitation Services

12       Planning  . . . . . . . . . . . . . . . . . . . . .  - 6 -

13           1.   Interdisciplinary Teams  . . . . . . . . .  - 6 -

14           2.   Integrated Therapeutic and Rehabilitation Service

15                Planning . . . . . . . . . . . . . . . . .  - 8 -

16  D.   Integrated Assessments . . . . . . . . . . . . . . .  - 19 -

17           1.   Psychiatric Assessments and Diagnoses  . .  - 20 -

18           2.   Psychological Assessments  . . . . . . . .  - 24 -

19           3.   Nursing Assessments  . . . . . . . . . . .  - 28 -

20           4.   Rehabilitation Therapy Assessments . . . .  - 30 -

21           5.   Nutrition Assessments  . . . . . . . . . .  - 31 -

22           6.   Social History Assessments . . . . . . . .  - 33 -

23           7.   Court Assessments  . . . . . . . . . . . .  - 34 -

24  E.   Discharge Planning and Community Integration . . . .  - 38 -

25  F.   Specific Therapeutic and Rehabilitation Services . .  - 40 -

26           1.   Psychiatric Services . . . . . . . . . . .  - 40 -

27           2.   Psychological Services . . . . . . . . . .  - 45 -

28

                                      3

1    3.    Nursing Services . . . . . . . . . . . . .    - 49 -
2    4.    Rehabilitation Therapy Services  . . . . .    - 52 -
3    5.    Nutrition Services . . . . . . . . . . . .    - 53 -
4    6.    Pharmacy Services  . . . . . . . . . . . .    - 55 -
5    7.    General Medical Services . . . . . . . . .    - 55 -
6    8.    Infection Control  . . . . . . . . . . . .    - 57 -
7    9.    Dental Services  . . . . . . . . . . . . .    - 58 -
8    10.   Special Education  . . . . . . . . . . . .    - 59 -
9    G.    Documentation  . . . . . . . . . . . . . . . . . .    - 61 -
10   H.    Restraints, Seclusion, and PRN and Stat Medications    - 61 -
11   I.    Protection From Harm . . . . . . . . . . . . . . .    - 65 -
12         1.    Incident Management  . . . . . . . . . .    - 65 -
13         2.    Performance Improvement  . . . . . . . .    - 72 -
14         3.    Environmental Conditions . . . . . . . .    - 74 -
15   J.    First Amendment and Due Process  . . . . . . . . .    - 75 -
16   ----------------------------------------------------------------
17
18
19
20
21
22
23
24
25
26
27
28

4

A.   Definitions

  1.   Effective Date

    The Effective Date will be considered the first day of the month following the date of execution of the agreement by all parties.  Unless otherwise specified, implementation of each provision of this Plan shall begin no later than 12 months after the Effective Date.

  2.   Consistent With Generally Accepted Professional Standards of Care

    A decision by a qualified professional that is substantially aligned with contemporary, accepted professional judgment, practice, or standards as to demonstrate that the person responsible based the decision on such accepted professional judgment.

B.   Introduction

Each State Hospital shall use a Recovery philosophy of care and a Psychiatric Rehabilitation model of service delivery. Therapeutic and rehabilitative services provided by each State Hospital shall be based on evidence-based practices and practice-based evidence, shall be age-appropriate, and shall be designed to:  strengthen and support individuals' recovery, rehabilitation, and habilitation; enable individuals to grow and develop in ways benefitting their mental health, physical health, and well being; and ensure individuals' reasonable safety, security, and freedom from undue bodily restraint.  Relationships between each State Hospital's staff and the individuals whom they serve shall be positive, therapeutic, and respectful.

5

1    Each individual served by each State Hospital shall be
2    encouraged to participate in identifying his or her needs and
3    goals, and in selecting appropriate treatment options.
4    Therapeutic and rehabilitation services shall be designed to
5    address each individual's needs and to assist individuals in
6    meeting their specific recovery and wellness goals, consistent
7    with generally accepted professional standards of care.  Each
8    State Hospital shall ensure clinical and administrative
9    oversight, education, and support of its staff in planning and
10   providing care and treatment consistent with these standards.
11   C.    Integrated Therapeutic and Rehabilitation Services Planning
12       Each State Hospital shall provide coordinated,
13   comprehensive, individualized protections, services, supports,
14   and treatments (collectively "therapeutic and rehabilitation
15   services") for the individuals it serves, consistent with
16   generally accepted professional standards of care.  In addition
17   to implementing the therapeutic and rehabilitation planning
18   provisions set forth below, each State Hospital shall establish
19   and implement standards, policies, and practices to ensure that
20   therapeutic and rehabilitation service determinations are
21   consistently made by an interdisciplinary team through integrated
22   therapeutic and rehabilitation service planning and embodied in a
23   single, integrated therapeutic and rehabilitation service plan.
24       1.    Interdisciplinary Teams
25            The interdisciplinary team's membership shall be
26       dictated by the particular needs and strengths of the
27       individual in the team's care.  At a minimum, each State
28

6

1   Hospital shall ensure that the team shall:

2       a.   Have as its primary objective the provision of

3            individualized, integrated therapeutic and

4            rehabilitation services that optimize the

5            individual's recovery and ability to sustain

6            himself/herself in the most integrated,

7            appropriate setting based on the individual's

8            strengths and functional and legal status and

9            support the individual's ability to exercise

10           his/her liberty interests, including the interests

11           of self determination and independence;

12      b.   Be led by a clinical professional who is involved

13           in the care of the individual;

14      c.   Function in an interdisciplinary fashion;

15      d.   Assume primary responsibility for the individual's

16           therapeutic and rehabilitation services, and

17           ensure the provision of competent, necessary, and

18           appropriate psychiatric and medical care;

19      e.   Ensure that each member of the team participates

20           appropriately, by competently and knowledgeably

21           assessing the individual on an ongoing basis and

22           by developing, monitoring, and, as necessary,

23           revising the therapeutic and rehabilitation

24           services;

25      f.   Ensure that assessment results and, as clinically

26           relevant, consultation results, are communicated

27           to the team members, along with the implications

28

7

of those results for diagnosis, therapy and
rehabilitation by no later than the next review;

g.   Be responsible for the scheduling and coordination
of assessments and team meetings, the drafting of
integrated treatment plans, and the scheduling and
coordination of necessary progress reviews;

h.   Consist of a stable core of members, including at
least the individual served; the treating
psychiatrist; the treating psychologist; the
treating rehabilitation therapist; the treating
social worker; the registered nurse and
psychiatric technician who know the individual
best; one of the individual's teachers (for
school-age individuals); and, as appropriate, the
individual's family, guardian, advocates,
attorneys, and the pharmacist and other staff;

i.   Not include any core treatment team members with a
case load exceeding 1:15 in admission teams (new
admissions of 90 days or less) and, on average,
1:25 in all other teams at any point in time; and

j.   Not include staff that is not verifiably competent
in the development and implementation of
interdisciplinary treatment plans.

2.   Integrated Therapeutic and Rehabilitation Service
Planning.

Each State Hospital shall develop and implement
policies and protocols regarding the development of
therapeutic and rehabilitation service plans, referred to as

8

1   "Wellness and Recovery Plans" ("WRP") consistent with
2   generally accepted professional standards of care, to ensure
3   that:

4       a.   Individuals have substantive input into the
5            therapeutic and rehabilitation service planning
6            process, including but not limited to input as to
7            mall groups and therapies appropriate to their
8            WRP.

9       b.   Therapeutic and rehabilitation service planning
10           provides timely attention to the needs of each
11           individual, in particular:

12           i.    initial therapeutic and rehabilitation
13                 service plans (Admission Wellness and
14                 Recovery Plan ("A-WRP")) are completed within
15                 24 hours of admission;

16           ii.   master therapeutic and rehabilitation service
17                 plans (WRP) are completed within 7 days of
18                 admission; and

19           iii.  therapeutic and rehabilitation service plan
20                 reviews are performed every 14 days during
21                 the first 60 days of hospitalization and
22                 every 30 days thereafter.  The third monthly
23                 review is a quarterly review and the 12th
24                 monthly review is the annual review.

25      c.   Treatment, rehabilitation, and enrichment services
26           are goal-directed, individualized, and informed by
27           a thorough knowledge of the individual's

28

9

1          psychiatric, medical, and psychosocial history and
2          previous response to such services.
3     d.   Therapeutic and rehabilitation service planning is
4          based on a comprehensive case formulation for each
5          individual that emanates from interdisciplinary
6          assessments of the individual consistent with
7          generally accepted professional standards of care.
8          Specifically, the case formulation shall:
9          i.    be derived from analyses of the information
10               gathered from interdisciplinary assessments,
11               including diagnosis and differential
12               diagnosis;
13         ii.   include a review of:  pertinent history;
14               predisposing, precipitating and perpetuating
15               factors; previous treatment history; and
16               present status;
17         iii.  consider biomedical, psychosocial, and
18               psychoeducational factors, as clinically
19               appropriate, for each category in § C.2.d.ii
20               above;
21         iv.   consider such factors as age, gender,
22               culture, treatment adherence, and medication
23               issues that may affect the outcomes of
24               treatment and rehabilitation interventions;
25         v.    support the diagnosis by diagnostic
26               formulation, differential diagnosis, and
27               Diagnostic and Statistical Manual-IV-TR (or
28               the most current edition) checklists; and

10

vi.   enable the interdisciplinary team to reach
      sound determinations about each individual's
      treatment, rehabilitation, enrichment and
      wellness needs, the type of setting to which
      the individual should be discharged, and the
      changes that will be necessary to achieve
      discharge.

e.   The therapeutic and rehabilitation service plan
     specifies the individual's focus of
     hospitalization (goals), assessed needs
     (objectives), and how the staff will assist the
     individual to achieve his or her goals/objectives
     (interventions).

f.   Therapeutic and rehabilitation service planning is
     driven by individualized needs, is strengths-based
     (i.e., builds on an individual's current
     strengths), addresses the individual's motivation
     for engaging in wellness activities, and leads to
     improvement in the individual's mental health,
     physical health, and well being, consistent with
     generally accepted professional standards of care.
     Specifically, the interdisciplinary team shall:

     i.   develop and prioritize reasonable and
          attainable goals/objectives (e.g., at the
          level of each individual's functioning) that
          build on the individual's strengths and
          address the individual's identified needs

11

and, if any identified need is not addressed, provide a rationale for not addressing the need;

ii. ensure that the objectives/interventions address treatment (e.g., for a disease or disorder), rehabilitation (e.g., skills/supports, motivation and readiness), and enrichment (e.g., quality of life activities);

iii. write the objectives in behavioral, observable, and/or measurable terms;

iv. include all objectives from the individual's current stage of change, or readiness for rehabilitation, to the maintenance stage for each focus of hospitalization, as clinically appropriate;

v. ensure that there are interventions that relate to each objective, specifying who will do what, within what time frame, to assist the individual to meet his/her needs as specified in the objective;

vi. implement interventions appropriately throughout the individual's day, with a minimum of 20 hours of active treatment per week. Individual or group therapy included in the individual's WRP shall be provided as part of the 20 hours of active treatment per week;

vii.  maximize, consistent with the individual's
      treatment needs and legal status,
      opportunities for treatment, programming,
      schooling, and other activities in the most
      appropriate integrated, non-institutional
      settings, as clinically appropriate; and

viii. ensure that each therapeutic and
      rehabilitation service plan integrates and
      coordinates all services, supports, and
      treatments provided by or through the State
      Hospital for the individual in a manner
      specifically responsive to the plan's
      therapeutic and rehabilitation goals.  This
      requirement includes, but is not limited to,
      ensuring that individuals are assigned to
      mall groups that link directly to the
      objectives of the individual's treatment plan
      and needs;

g.  Therapeutic and rehabilitation service plans are
    revised as appropriate to ensure that planning is
    based on the individual's progress, or lack
    thereof, as determined by the scheduled monitoring
    of identified criteria or target variables,
    consistent with generally accepted professional
    standards of care.  Specifically, the
    interdisciplinary team shall:

    i.  revise the focus of hospitalization
        objectives, as needed, to reflect the

13

individual's changing needs and develop new
interventions to facilitate attainment of new
objectives when old objectives are achieved
or when the individual fails to make progress
toward achieving these objectives;

ii.    review the focus of hospitalization, needs,
objectives, and interventions more frequently
if there are changes in the individual's
functional status or risk factors (i.e.,
behavioral, medical, and/or psychiatric risk
factors);

iii.   ensure that the review process includes an
assessment of progress related to discharge
to the most integrated setting appropriate to
meet the individual's assessed needs,
consistent with his/her legal status; and

iv.    base progress reviews and revision
recommendations on data collected as
specified in the therapeutic and
rehabilitation service plan.

h.  Individuals in need of positive behavior supports
in school or other settings receive such supports
consistent with generally accepted professional
standards of care.

i.  Adequate active psychosocial rehabilitation is
provided, consistent with generally accepted

14

professional standards of care, that:

i.   is based on the individual's assessed needs and is directed toward increasing the individual's ability to engage in more independent life functions;

ii.  has documented objectives, measurable outcomes, and standardized methodology;

iii. is aligned with the individual's objectives that are identified in the individual's WRP;

iv.  utilizes the individual's strengths, preferences, and interests;

v.   focuses on the individual's vulnerabilities to mental illness, substance abuse, and readmission due to relapse, where appropriate;

vi.  is provided in a manner consistent with each individual's cognitive strengths and limitations;

vii. provides progress reports for review by the Interdisciplinary Team as part of the WRP review process;

viii. is provided 5 days a week, for a minimum of 4 hours a day (i.e., 2 hours in the morning and 2 hours in the afternoon each weekday), for each individual or 2 hours a day when the individual is in school, except days falling on state holidays;

15

  ix. is provided to individuals in bed-bound
    status in a manner and for a period that is
    commensurate with their medical status;
  x. routinely takes place as scheduled;
  xi. includes, in the evenings and weekends,
    additional activities that enhance the
    individual's quality of life; and
  xii. is consistently reinforced by staff on the
    therapeutic milieu, including living units.

j. Adequate individualized and group exercise and
recreational options are provided, consistent with
generally accepted professional standards of care.

k. Individuals who have an assessed need for family
therapy services receive such services in their
primary language, as feasible, consistent with
generally accepted professional standards of care
and that these services, and their effectiveness
for addressing the indicated problem, are
comprehensively documented in each individual's
chart.

l. Each individual's therapeutic and rehabilitation
service plan identifies general medical diagnoses,
the treatments to be employed, the related symptoms
to be monitored by nursing staff (i.e., registered
nurses ("RNs"), licensed vocational nurses
("LVNs"), and psychiatric technicians) and the
means and frequency by which such staff shall

16

1          monitor such symptoms, consistent with generally

2          accepted professional standards of care.

3      m.  Children and adolescents receive, consistent with

4          generally accepted professional standards of care:

5          i.    therapy relating to traumatic family and

6                other traumatic experiences, as clinically

7                indicated; and

8          ii.   reasonable, clinically appropriate

9                opportunities to involve their families in

10               treatment and treatment decisions.

11     n.  Policies and procedures are developed and

12         implemented consistent with generally accepted

13         professional standards of care to ensure

14         appropriate screening for substance abuse, as

15         clinically indicated.

16     o.  Individuals who require treatment for substance

17         abuse are provided appropriate therapeutic and

18         rehabilitation services consistent with generally

19         accepted professional standards of care.

20     p.  Group facilitators and therapists providing

21         therapeutic and rehabilitation services (in groups

22         or individual therapy) are verifiably competent

23         regarding selection and implementation of

24         appropriate approaches and interventions to address

25         therapeutic and rehabilitation service objectives,

26         are verifiably competent in monitoring individuals'

27         responses to therapy and rehabilitation, and

28         receive regular, competent supervision.

17

1    q.  Group facilitators and therapists providing
2        therapeutic and rehabilitation services in the
3        field of substance abuse should be certified
4        substance abuse counselors.
5    r.  Transportation and staffing issues do not preclude
6        individuals from attending appointments.
7    s.  Adequate oversight to treatment, rehabilitation,
8        and enrichment groups is provided to ensure that
9        individuals are assigned to groups that are
10       appropriate to their assessed needs, that groups
11       are provided consistently and with appropriate
12       frequency, and that issues particularly relevant
13       for this population, including the use of
14       psychotropic medications and substance abuse, are
15       appropriately addressed, consistent with generally
16       accepted professional standards of care.
17   t.  Treatment, rehabilitation, and enrichment services
18       are monitored appropriately against rational,
19       operationally-defined target variables and revised
20       as appropriate in light of significant
21       developments, and the individual's progress, or
22       lack thereof.
23   u.  Individuals are educated regarding the purposes of
24       their treatment, rehabilitation, and enrichment
25       services.  They will be provided a copy of their
26       WRP when appropriate based on clinical judgment.
27   v.  Staff educate individuals about their medications,
28       the expected results, and the potential common

18

1              and/or serious side effects of medications, and

2              staff regularly ask individuals about common and/or

3              serious side effects they may experience.

4         w.   Interdisciplinary teams review, assess, and develop

5              positive clinical strategies to overcome

6              individual's barriers to participation in

7              therapeutic and rehabilitation services.

8  D.    Integrated Assessments

9        Each State Hospital shall ensure that, consistent with

10 generally accepted professional standards of care, each

11 individual shall receive, promptly after admission to the State

12 Hospital, an accurate and comprehensive assessment of the

13 conditions responsible for the individual's admission, to the

14 degree possible given the obtainable information at the time of

15 admission.  Thereafter, each individual shall receive an accurate

16 and comprehensive reassessment of the reasons for the

17 individual's continued hospitalization whenever there has been a

18 significant change in the individual's status, or a lack of

19 expected improvement resulting from clinically indicated

20 treatment.  The individual's interdisciplinary team shall be

21 responsible for investigating the past and present medical,

22 nursing, psychiatric, and psychosocial factors bearing on the

23 individual's condition, and, when necessary, for revising

24 assessments and therapeutic and rehabilitation plans in

25 accordance with new information that comes to light.  Each State

26 Hospital shall monitor and promptly address deficiencies in the

27 quality and timeliness of such assessments.

28

19

1    1.    Psychiatric Assessments and Diagnoses

2         Each State Hospital shall provide all of the

3    individuals it serves with routine and emergency psychiatric

4    assessments and reassessments consistent with generally

5    accepted professional standards of care; and:

6         a.    Each State Hospital shall use the diagnostic

7             criteria in the most current Diagnostic and

8             Statistical Manual of Mental Disorders ("DSM") for

9             reaching the most accurate psychiatric diagnoses.

10       b.    Each State Hospital shall ensure that all

11           psychiatrists responsible for performing or

12           reviewing psychiatric assessments:

13           i.    are certified by the American Board of

14                 Psychiatry and Neurology ("ABPN") or have

15                 successfully completed at least three years

16                 of psychiatric residency training in a

17                 Accreditation Counsel for Graduate Medical

18                 Education accredited program; and

19           ii.    are verifiably competent (as defined by

20                 privileging at initial appointment and

21                 thereafter by repriviliging for continued

22                 appointment) in performing psychiatric

23                 assessments consistent with the State

24                 Hospital's standard diagnostic protocols.

25       c.    Each State Hospital shall ensure that:

26           i.    within 24 hours of an individual's admission

27                 to the State Hospital, the individual

28

20

1   receives an Admission Medical Assessment that
2   includes:
3   1)   a review of systems;
4   2)   medical history;
5   3)   physical examination;
6   4)   diagnostic impressions; and
7   5)   management of acute medical conditions.
8   ii.   within 24 hours of an individual's admission
9   to the State Hospital, the individual
10   receives an Admission Psychiatric Evaluation
11   that includes:
12   1)   psychiatric history, including a review
13   of presenting symptoms;
14   2)   complete mental status examination;
15   3)   admission diagnoses;
16   4)   completed AIMS;
17   5)   laboratory tests ordered; and
18   6)   consultations ordered.
19   iii.   Within 7 days of an individual's admission to
20   the State Hospital, the individual receives
21   an Integrated Psychiatric Assessment that
22   includes:
23   1)   psychiatric history, including a review
24   of present and past history;
25   2)   psychosocial history;
26   3)   mental status examination;
27   4)   strengths;
28   5)   psychiatric risk factors;

21

1            6)    diagnostic formulation;

2            7)    differential diagnosis;

3            8)    current psychiatric diagnoses;

4            9)    psychopharmacology treatment plan; and

5            10)    management of identified risks.

6    d.    Each State Hospital shall ensure that:

7        i.    clinically justifiable diagnoses are provided

8            for each individual, and all diagnoses that

9            cannot be clinically justified for an

10            individual are discontinued no later than the

11            next review;

12        ii.    the documented justification of the diagnoses

13            is in accord with the criteria contained in

14            the most current DSM (as per DSM-IV-TR

15            Checklist);

16        iii.    differential diagnoses, "deferred," or

17            "rule-out" diagnoses, and diagnoses listed as

18            "NOS" ("Not Otherwise Specified") are timely

19            addressed (i.e., within 60 days), through

20            clinically appropriate assessments, and

21            resolved in a clinically justifiable manner;

22            and

23        iv.    "no diagnosis" is clinically justified and

24            documented.

25    e.    Each State Hospital shall ensure that psychiatric

26        reassessments are conducted at a frequency that

27        reflects the individual's clinical needs.  At a

28        minimum the reassessments are completed weekly for

22

the first 60 days on the admissions units and
monthly on other units.

f.  Each State Hospital shall ensure that psychiatric
reassessments are documented in progress notes that
address the following:

i.    significant developments in the individual's
      clinical status and appropriate psychiatric
      follow up;

ii.   timely and justifiable updates of diagnosis
      and treatment, as clinically appropriate;

iii.  analyses of risks and benefits of chosen
      treatment interventions;

iv.   assessment of, and attention to, high-risk
      behaviors (e.g., assaults, self-harm, falls)
      including appropriate and timely monitoring
      of individuals and interventions to reduce
      risks;

v.    responses to and side effects of prescribed
      medications, with particular attention to
      risks associated with the use of
      benzodiazepines, anticholinergic medications,
      polypharmacy (use of multiple drugs to
      address the same condition), and conventional
      and atypical antipsychotic medications;

vi.   timely review of the use of "pro re nata" or
      "as-needed" ("PRN") and "Stat" (i.e.,
      emergency psychoactive) medications and

23

1          adjustment of regular treatment, as

2          indicated, based on such use; and

3     vii.  verification, in a clinically justifiable

4          manner, that psychiatric and behavioral

5          treatments are properly integrated.   The

6          psychiatrist shall review the positive

7          behavior support plan prior to implementation

8          to ensure consistency with psychiatric

9          formulation, document evidence of regular

10         exchange of data or information with

11         psychologists regarding differentiation of

12         learned behaviors and behaviors targeted for

13         psychopharmacological treatments, and

14         document evidence of integration of

15         treatments.

16    g.  When individuals are transferred between treatment

17        teams, a psychiatric transfer note shall be

18        completed addressing:   review of medical and

19        psychiatric course of hospitalization, including

20        medication trials; current target symptoms;

21        psychiatric risk assessment; current barriers to

22        discharge; and anticipated benefits of transfer.

23  2.  Psychological Assessments

24    a.  Each State Hospital shall develop and implement

25        standard psychological assessment protocols,

26        consistent with generally accepted professional

27        standards of care.   These protocols shall address,

28        at a minimum, diagnostic neuropsychological

24

1        assessments, cognitive assessments, and

2        I.Q./achievement assessments, to guide

3        psychoeducational (e.g., instruction regarding the

4        illness or disorder, and the purpose or objectives

5        of treatments for the same, including medications),

6        educational, rehabilitation, and habilitation

7        interventions, and behavioral assessments

8        (including functional assessment of behavior in

9        schools and other settings), and personality

10       assessments, to inform positive behavior support

11       plans and psychiatric diagnoses.

12   b.  Each State Hospital shall require the completion of

13       cognitive and academic assessments within 30 days

14       of admission of all school-age and other

15       individuals, as required by law, unless comparable

16       testing has been performed within one year of

17       admission and is available to the interdisciplinary

18       team.

19   c.  Each State Hospital shall ensure that all

20       clinicians responsible for performing or reviewing

21       psychological assessments and evaluations are

22       verifiably competent in the methodology required to

23       conduct the assessment.

24   d.  Each State Hospital shall ensure that all

25       psychological assessments, consistent with

26       generally accepted professional standards of care,

27       shall:

28

25

i.  expressly state the clinical question(s) for the assessment;

ii.  include findings specifically addressing the clinical question(s), but not limited to diagnoses and treatment recommendations;

iii.  specify whether the individual would benefit from individual therapy or group therapy in addition to attendance at mall groups;

iv.  be based on current, accurate, and complete data;

v.  determine whether behavioral supports or interventions (e.g., behavior guidelines or mini-behavior plans) are warranted or whether a full positive behavior support plan is required;

vi.  include the implications of the findings for interventions;

vii.  identify any unresolved issues encompassed by the assessment and, where appropriate, specify further observations, records review, interviews, or re-evaluations that should be performed or considered to resolve such issues; and

viii.  Use assessment tools and techniques appropriate for the individuals assessed and in accordance with the American Psychological Association Ethical Standards and Guidelines for testing.

26

1    e.  Each State Hospital shall ensure that all
2        psychological assessments of all individuals
3        residing at the State Hospital who were admitted
4        there before the Effective Date hereof shall be
5        reviewed by qualified clinicians with demonstrated
6        current competency in psychological testing and, as
7        indicated, revised to meet the criteria in
8        § D.2.a & d, above.
9    f.  Each State Hospital shall ensure that all
10        appropriate psychological assessments shall be
11        provided in a timely manner whenever clinically
12        indicated, consistent with generally accepted
13        professional standards of care, including whenever
14        there has been a significant change in condition, a
15        lack of expected improvement resulting from
16        treatment, or an individual's behavior poses a
17        significant barrier to treatment, therapeutic
18        programming, safety to self or others, or school
19        programming, and, in particular:
20        i.   before an individual's therapeutic and
21             rehabilitation service plan is developed, a
22             psychological assessment of the individual
23             shall be performed that will:
24             1)  address the nature of the individual's
25                 impairments to inform the psychiatric
26                 diagnosis; and
27             2)  provide an accurate evaluation of the
28                 individual's psychological functioning

27

1       to inform the therapeutic and

2       rehabilitation service planning process;

3    ii. if behavioral interventions are indicated, a

4      structural and functional assessment shall be

5      performed, consistent with generally accepted

6      professional standards of care, by a

7      professional having demonstrated competency

8      in positive behavior supports; and

9    iii. additional psychological assessments shall be

10     performed, as appropriate, where clinical

11     information is otherwise insufficient, and to

12     address unresolved clinical or diagnostic

13     questions, including differential diagnosis,

14     "rule-out," "deferred," "no-diagnosis" and

15     "NOS" diagnoses.

16  g. For individuals whose primary language is not

17    English, each State Hospital shall endeavor to

18    assess them in their own language; if this is not

19    possible, each State Hospital will develop and

20    implement a plan to meet the individual's

21    assessment needs, including, but not limited to the

22    use of interpreters in the individual's primary

23    language and dialect, if feasible.

24 3. Nursing Assessments

25  a. Each State Hospital shall develop standard nursing

26    assessment protocols, consistent with generally

27    accepted professional standards of care.  These

28    protocols shall address, at a minimum:

1        i.    a description of presenting conditions;

2        ii.   current prescribed medications;

3        iii.  vital signs;

4        iv.   allergies;

5        v.    pain;

6        vi.   use of assistive devices;

7        vii.  activities of daily living;

8        viii. immediate alerts (e.g., escape risk, physical

9              assault, choking risk, suicidal risk,

10             homicide risk, fall risk, sexual assault,

11             self-injurious behavior, arson, or fire

12             setting); and

13       ix.   conditions needing immediate nursing

14             interventions.

15    b.  Nursing may use a systems model (e.g., Johnson

16        Behavioral System Model) for the nursing

17        evaluation.

18    c.  Each State Hospital shall ensure that all nurses

19        responsible for performing or reviewing nursing

20        assessments are verifiably competent in performing

21        the assessments for which they are responsible.

22        All nurses who are employed at Metropolitan State

23        Hospital shall have graduated from an approved

24        nursing program, shall have passed the NCLEX-RN and

25        shall have a license to practice in the state of

26        California.

27

28

29

1      d.   Each State Hospital shall ensure that nursing

2           assessments are undertaken on a timely basis, and

3           in particular, that:

4           i.    initial nursing assessments are completed

5                 within 24 hours of the individual's

6                 admission;

7           ii.   Further nursing assessments are completed and

8                 integrated into the individual's therapeutic

9                 and rehabilitation service plan within 7 days

10                of admission; and

11          iii.  nursing assessments are reviewed every 14

12                days during the first 60 days of admission

13                and every 30 days thereafter and updated as

14                appropriate.   The 3rd monthly review shall be

15                a quarterly review and the 12th monthly

16                review shall be the annual review.

17   4.   Rehabilitation Therapy Assessments

18      a.   Each State Hospital shall develop standard

19           rehabilitation therapy assessment protocols,

20           consistent with generally accepted professional

21           standards of care, for satisfying the necessary

22           components of a comprehensive rehabilitation

23           therapy assessment.

24      b.   Each State Hospital shall ensure that each

25           individual served shall have a rehabilitation

26           assessment that, consistent with generally accepted

27           professional standards of care:

28

30

        i.    is accurate and comprehensive as to the
individual's functional abilities;

        ii.   identifies the individual's current
functional status and the skills and supports
needed to facilitate transfer to the next
level of care; and

        iii.  identifies the individual's life goals,
strengths, and motivation for engaging in
wellness activities.

c. Each State Hospital shall ensure that all
clinicians responsible for performing or reviewing
rehabilitation therapy assessments are verifiably
competent in performing the assessments for which
they are responsible.

d. Each State Hospital shall ensure that all
rehabilitation therapy assessments of all
individuals who were admitted to the State Hospital
before the Effective Date hereof shall be reviewed
by qualified clinicians and, as indicated, revised
to meet the criteria in § D.4.b, above.

5. Nutrition Assessments

Each State Hospital shall provide nutrition
assessments, reassessments, and interventions consistent
with generally accepted professional standards of care. A
comprehensive nutrition assessment will include the
following:

a. For new admissions with high risk referral (e.g.,
type I diabetes mellitus, enteral/parenteral

31

1    feeding, dysphagia/recent choking episode), or upon
2    request by physician, a comprehensive Admission
3    Nutrition Assessment will be completed within 24
4    hours of notification to the dietitcian.
5    b.  For new admissions directly into the
6    medical-surgical unit, a comprehensive Admission
7    Nutrition Assessment will be completed within 3
8    days of admission.
9    c.  For new admissions directly into the skilled
10   nursing facility unit, a comprehensive Admission
11   Nutrition Assessment will be completed within 7
12   days of admission.
13   d.  For new admissions with identified nutritional
14   triggers from Nursing Admission Assessment or
15   physician's consult (e.g., for severe food
16   allergies, tube feeding, extensive dental problems
17   or dental surgery, NPO/clear liquid diet for more
18   than three days, uncontrolled diarrhea/vomiting
19   more than 24 hours, and MAOI, as clinically
20   indicated), a comprehensive Admission Nutrition
21   Assessment will be completed within 7 days of
22   admission.
23   e.  For new admissions with therapeutic diet orders for
24   medical reasons, a comprehensive Admission
25   Nutrition Assessment will be completed within 7
26   days of admission.
27   f.  For individuals with therapeutic diet orders for
28   medical reason after admission, a comprehensive

32

1          Admission Nutrition Assessment will be completed
2          within 7 days of the therapeutic diet order but no
3          later than 30 days of admission.
4      g.  For all other individuals, a comprehensive
5          Admission Nutrition Assessment will be completed
6          within 30 days of admission.
7      h.  Acuity level of an individual at nutritional risk
8          will be determined by Nutritional Status Type
9          ("NST") which defines minimum services provided by
10         a registered dietitian.
11     i.  The frequency of a comprehensive Nutrition
12         Assessment Update will be determined by the NST.
13         Updates should include, but not be limited to:
14         subjective data, weight, body-mass index ("BMI"),
15         waist circumference, appropriate weight range, diet
16         order, changes in pertinent medication, changes in
17         pertinent medical/psychiatric problems, changes in
18         nutritional problem(s), progress toward
19         goals/objectives, effectiveness of interventions,
20         changes in goals/plan, recommendations, and
21         follow-up as needed.
22     j.  Every individual will be assessed annually.   In
23         addition, individuals will be reassessed when there
24         is a significant change in condition.
25  6.  Social History Assessments
26      Each State Hospital shall ensure that each individual
27  has a social history evaluation that, consistent with
28  generally accepted professional standards of care:

33

1        a.  Is, to the extent reasonably possible, accurate,

2            current and comprehensive;

3        b.  Expressly identifies factual inconsistencies among

4            sources, resolves or attempts to resolve

5            inconsistencies, and explains the rationale for the

6            resolution offered;

7        c.  Is included in the 7-day integrated assessment and

8            fully documented by the 30th day of an individual's

9            admission; and

10       d.  Reliably informs the individual's interdisciplinary

11           team about the individual's relevant social factors

12           and educational status.

13    7.   Court Assessments

14        a.  Each State Hospital shall develop and implement

15           policies and procedures to ensure an

16           interdisciplinary approach to the development of

17           court submissions for individuals adjudicated "not

18           guilty by reason of insanity" ("NGI") pursuant to

19           Penal Code Section 1026, based on accurate

20           information and individualized risk assessments.

21           The forensic reports should include the following,

22           as clinically indicated:

23           i.    clinical progress and achievement of

24                   stabilization of signs and symptoms of mental

25                   illness that were the cause, or contributing

26                   factor in the commission of the crime (i.e.,

27                   instant offense);

28

34

1        ii.   acts of both verbal and physical aggression

2              and property destruction during the past year

3              of hospitalization and, if relevant, past

4              acts of aggression and dangerous criminal

5              behavior;

6       iii.  understanding of potential for danger and

7              precursors of dangerous/criminal behavior,

8              including instant offense;

9       iv.   acceptance of mental illness and

10             understanding of the need for treatment, both

11             psychosocial and biological, and the need to

12             adhere to treatment;

13       v.   development of relapse prevention plan (i.e.,

14             Personal Wellness Recovery Plan or Wellness

15             Recovery Action Plan) for mental illness

16             symptoms, including the individual's

17             recognition of precursors and warning signs

18             and symptoms and precursors for dangerous

19             acts;

20       vi.   willingness to achieve understanding of

21             substance abuse issues and to develop an

22             effective relapse prevention plan (as defined

23             above);

24       vii.  previous community releases, if the

25             individual has had previous CONREP

26             revocations;

27      viii. social support, financial resources, family

28             conflicts, cultural marginalization, and

1              history of sexual and emotional abuse, if

2              applicable; and

3        ix.   relevant medical issues, all self-harm

4              behaviors, risks for self harm and risk of

5              harm to others, to inform the courts and the

6              facility where the individual will be housed

7              after discharge.

8    b.  Each State Hospital shall develop and implement

9        policies and procedures to ensure an

10       interdisciplinary approach to the development of

11       court submissions for individuals admitted to the

12       hospital pursuant to Penal Code Section 1370,

13       "incompetent to stand trial" ("IST"), based on

14       accurate information and individualized risk

15       assessments.  Consistent with the right of an

16       individual accused of a crime to a speedy trial,

17       the focus of the IST hospitalization shall be the

18       stabilization of the symptoms of mental illness so

19       as to enable the individual to understand the legal

20       proceedings and to assist his or her attorney in

21       the preparation of the defense.  The forensic

22       reports should include the following:

23       i.    relevant clinical description of initial

24             presentation, if available, which caused the

25             individual to be deemed incompetent to stand

26             trial by the court;

27       ii.   clinical description of the individual at the

28             time of admission to the hospital;

36

1    iii.    course of hospital stay, describing any
2            progress or lack of progress, response to
3            treatment, current relevant mental status,
4            and reasoning to support the recommendation;
5            and

6    iv.     all self-harm behaviors and relevant medical
7            issues, to inform the courts and the facility
8            where the individual will be housed after
9            discharge.

10   c.  Each State Hospital shall establish a Forensic
11       Review Panel ("FRP") to serve as the internal body
12       that reviews and provides oversight of facility
13       practices and procedures regarding the forensic
14       status of all individuals admitted pursuant to
15       Penal Code 1026 and 1370.  The FRP shall review and
16       approve all forensic court submissions by the
17       Wellness and Recovery teams and ensure that
18       individuals receive timely and adequate assessments
19       by the teams to evaluate changes in their
20       psychiatric condition, behavior and/or risk factors
21       that may warrant modifications in their forensic
22       status and/or level of restriction.  The membership
23       of the FRP shall include the Director of Forensic
24       Psychiatry, Facility Director or designee, Medical
25       Director or designee, Chief of Psychology or
26       designee, Chief of Social Services or designee,
27       Chief of Nursing Services or designee, and Chief of
28       Rehabilitation Services or designee.  The Director

37

1                    of Forensic Psychiatry shall serve as the chair and

2                    shall be a board certified forensic psychiatrist.

3                    A quorum shall consist of a minimum of four FRP

4                    members or their designees.

5  E.   Discharge Planning and Community Integration

6        Taking into account the limitations of court-imposed

7  confinement, the State shall pursue actively the appropriate

8  discharge of individuals under the State's care at each State

9  Hospital and, subject to legal limitations on the State's control

10 of the placement process, provide services in the most

11 integrated, appropriate setting in which they reasonably can be

12 accommodated, as clinically appropriate, that is consistent with

13 each individual's needs.

14       1.   Each State Hospital shall identify at the 7-day

15            therapeutic and rehabilitation service planning

16            conference, and address at all subsequent planning

17            conferences, the particular considerations for each

18            individual bearing on discharge, including:

19            a.   those factors that likely would foster successful

20                 discharge, including the individual's strengths,

21                 preferences, and personal life goals;

22            b.   the individual's level of psychosocial functioning;

23            c.   any barriers preventing the individual from

24                 transitioning to a more integrated environment,

25                 especially difficulties raised in previously

26                 unsuccessful placements; and

27            d.   the skills and supports necessary to live in the

28                 setting in which the individual will be placed.

38

1    2.    Each State Hospital shall ensure that, beginning at the
2          time of admission and continuously throughout the
3          individual's stay, the individual is an active
4          participant in the discharge planning process, to the
5          fullest extent possible, given the individual's level
6          of functioning and legal status.

7    3.    Each State Hospital shall ensure that, consistent with
8          generally accepted professional standards of care, each
9          individual has a professionally developed discharge
10         plan that is integrated within the individual's
11         therapeutic and rehabilitation service plan, that
12         addresses his or her particular discharge
13         considerations, and that includes:

14         a.   Measurable interventions regarding these discharge
15              considerations;

16         b.   The staff responsible for implementing the
17              interventions; and

18         c.   The time frames for completion of the
19              interventions.

20   4.    Each State Hospital shall provide transition supports
21         and services consistent with generally accepted
22         professional standards of care. In particular, each
23         State Hospital shall ensure that:

24         a.   Individuals who have met discharge criteria are
25              discharged expeditiously, subject to the
26              availability of suitable placements; and

27         b.   Individuals receive adequate assistance in
28              transitioning to the new setting.

39

1    5.   For all children and adolescents it serves, each State
2         Hospital shall:

3         a.  Develop and implement policies and protocols that
4             identify individuals with lengths of stay exceeding
5             six months; and

6         b.  Establish a regular review forum, which includes
7             senior administration staff, to assess the children
8             and adolescents identified in § E.5.a, above, to
9             review their treatment plans, and to create an
10            individualized action plan for each such child or
11            adolescent that addresses the obstacles to
12            successful discharge to the most integrated,
13            appropriate placement as clinically and legally
14            indicated.

15  F.   Specific Therapeutic and Rehabilitation Services

16   1.   Psychiatric Services

17        a.  Each State Hospital shall develop and implement
18            policies and procedures to ensure system-wide
19            monitoring of the safety, efficacy, and
20            appropriateness of all psychotropic medication use,
21            consistent with generally accepted professional
22            standards of care.  In particular, policies and
23            procedures shall require monitoring of the use of
24            psychotropic medications to ensure that they are:
25            i.   specifically matched to current, clinically
26                 justified diagnoses or clinical symptoms;

27

28

                              40

ii.     prescribed in therapeutic amounts, as
        dictated by the needs of the individual
        served;

iii.    tailored to each individual's symptoms;

iv.     monitored for effectiveness against clearly
        identified target variables and time frames;

v.      monitored appropriately for side effects;

vi.     modified based on clinical rationales;

vii.    not inhibiting individuals from meaningfully
        participating in treatment, rehabilitation,
        or enrichment and educational services as a
        result of excessive sedation; and

viii. properly documented.

b.  Each State Hospital shall monitor the use of PRN
    and Stat medications to ensure that these
    medications are administered in a manner that is
    clinically justified and are not used as a
    substitute for appropriate long-term treatment of
    the individual's condition.

c.  Each State Hospital shall monitor the psychiatric
    use of benzodiazepines, anticholinergics, and
    polypharmacy to ensure clinical justification and
    attention to associated risks.

d.  Each State Hospital shall ensure the monitoring of
    the metabolic and endocrine risks associated with
    the use of new generation antipsychotic
    medications.

41

1      e.  Each State Hospital shall ensure regular
2          monitoring, using a validated rating instrument
3          (such as AIMS or DISCUS), of tardive dyskinesia
4          ("TD"); a baseline assessment shall be performed
5          for each individual at admission with subsequent
6          monitoring of the individual every 12 months while
7          he/she is receiving antipsychotic medication, and
8          every 3 months if the test is positive, TD is
9          present, or the individual has a history of TD.
10     f.  Each State Hospital shall ensure timely
11         identification, reporting, data analyses, and
12         follow up remedial action regarding all adverse
13         drug reactions ("ADR").
14     g.  Each State Hospital shall ensure drug utilization
15         evaluation ("DUE") occurs in accord with
16         established, up-to-date medication guidelines that
17         shall specify indications, contraindications, and
18         screening and monitoring requirements for all
19         psychotropic medications; the guidelines shall be
20         in accord with current professional literature.  A
21         verifiably competent psychopharmacology consultant
22         shall approve the guidelines and ensure adherence
23         to the guidelines.
24     h.  Each State Hospital shall ensure documentation,
25         reporting, data analyses, and follow up remedial
26         action regarding actual and potential medication
27         variances ("MVR") consistent with generally
28         accepted professional standards of care.

42

i.  Each State Hospital shall ensure tracking of
    individual and group practitioner trends, including
    data derived from monitoring of the use of PRNs,
    Stat medications, benzodiazepines,
    anticholinergics, and polypharmacy, and of ADRs,
    DUE, and MVR consistent with generally accepted
    professional standards of care.

j.  Each State Hospital shall ensure feedback to the
    practitioner and educational/corrective actions in
    response to identified trends consistent with
    generally accepted professional standards of care.

k.  Each State Hospital shall ensure integration of
    information derived from ADRs, DUE, MVR, and the
    Pharmacy & Therapeutics, Therapeutics Review, and
    Mortality and Morbidity Committees consistent with
    generally accepted professional standards of care.

l.  Each State Hospital shall ensure that all
    physicians and clinicians are verifiably competent,
    consistent with generally accepted professional
    standards of care, in appropriate medication
    management, interdisciplinary team functioning, and
    the integration of behavioral and pharmacological
    treatments.

m.  Each State Hospital shall review and ensure the
    appropriateness and safety of the medication
    treatment, consistent with generally accepted
    professional standards of care, for:

43

1           i.      all individuals prescribed continuous

2                   anticholinergic treatment for more than two

3                   months;

4          ii.      all elderly individuals and individuals with

5                   cognitive disorders who are prescribed

6                   continuous anticholinergic treatment

7                   regardless of duration of treatment;

8          iii.     all individuals prescribed benzodiazepines as

9                   a scheduled modality for more than two

10                  months;

11         iv.      all individuals prescribed benzodiazepines

12                  with diagnoses of substance abuse or

13                  cognitive impairments, regardless of duration

14                  of treatment;

15         v.       all individuals with a diagnosis or

16                  evidencing symptoms of tardive dyskinesia;

17                  and

18         vi.      all individuals diagnosed with dyslipidemia,

19                  and/or obesity, and/or diabetes mellitus who

20                  are prescribed new generation antipsychotic

21                  medications.

22    n.    Each State Hospital shall ensure that the

23          medication management of individuals with substance

24          abuse disorders is provided consistent with

25          generally accepted professional standards of care.

26    o.    Metropolitan State Hospital shall provide a minimum

27          of 16 hours per year of psychopharmacology

28          instruction, through conferences, seminars,

44

1           lectures and/or videotapes.  Such instruction may
2           be provided either on-site or through attendance at
3           conferences elsewhere.

4    2.   Psychological Services

5        Each State Hospital shall provide adequate and
6    appropriate psychological supports and services that are
7    derived from evidence-based practice or practice-based
8    evidence and are consistent with generally accepted
9    professional standards of care, to individuals who require
10   such services; and:

11       a.  Each State Hospital shall ensure that it has
12           positive behavior support teams (with 1 team for
13           each 300 individuals, consisting of 1 clinical
14           psychologist, 1 registered nurse, 2 psychiatric
15           technicians (1 of whom may be a behavior
16           specialist), and 1 data analyst (who may be a
17           behavior specialist) that have a demonstrated
18           competence, consistent with generally accepted
19           professional standards of care, in the following
20           areas:

21           i.    the development and use of positive behavior
22                 support plans, including methods of
23                 monitoring program interventions and the
24                 effectiveness of the interventions, providing
25                 staff training regarding program
26                 implementation, and, as appropriate, revising
27                 or terminating the program; and

28

45

1        ii.    the development and implementation of a
2               facility-wide behavioral incentive system,
3               referred to as "BY CHOICE," that encompasses
4               self-determination and choice by the
5               individuals served.
6    b.  Each State Hospital shall ensure that the Chief of
7        Psychology has the clinical and administrative
8        responsibility for the Positive Behavior Support
9        Team and the BY CHOICE incentive program.
10   c.  Each State Hospital shall ensure that:
11       i.    behavioral assessments include structural and
12              functional assessments, and, as necessary,
13              functional analysis;
14       ii.   hypotheses on the maladapative behavior are
15              based on structural and functional
16              assessments;
17       iii.  there is documentation of previous behavioral
18              interventions and their effects;
19       iv.   behavioral interventions, which shall include
20              positive behavior support plans, are based on
21              a positive behavior supports model and do not
22              include the use of aversive or punishment
23              contingencies;
24       v.    behavioral interventions are consistently
25              implemented across all settings, including
26              school settings;
27       vi.   triggers for instituting individualized
28              behavioral interventions are specified and

46

1           utilized, and that these triggers include
2           excessive use of seclusion, restraint, or
3           psychiatric PRN and Stat medication for
4           behavior control;

5      vii.  positive behavior support teams and team
6           psychologists integrate their therapies with
7           other treatment modalities, including drug
8           therapy;

9      viii. all positive behavior support plans are
10          specified in the objectives and interventions
11          sections of the individual's WRP;

12     ix.   all positive behavior support plans are
13          updated as indicated by outcome data and
14          reported at least quarterly in the present
15          status section of the case formulation in the
16          individual's WRP;

17     x.    all staff has received competency-based
18          training on implementing the specific
19          behavioral interventions for which they are
20          responsible, and performance improvement
21          measures are in place for monitoring the
22          implementation of such interventions;

23     xi.   all positive behavior support team members
24          shall have as their primary responsibility
25          the provision of behavioral interventions;
26          and

27     xii.  the BY CHOICE point allocation is updated
28          monthly in the individual's WRP.

47

1

2      d.  Each State Hospital shall ensure that it has at

3          least one developmental and cognitive abilities

4          team (consisting of 1 clinical psychologist, 1

5          registered nurse, 1 social worker, 1 psychiatric

6          technician, and 1 data analyst (who may be a

7          behavior specialist)) who have a demonstrated

8          competence, consistent with generally accepted

9          professional standards of care, in:  assessing

10         individuals with cognitive challenges/disorders;

11         developing therapeutic interventions (including

12         positive behavior supports); advising therapy and

13         rehabilitation providers on the implementation of

14         interventions at the cognitive level of the

15         individuals; and managing discharge processes for

16         individuals with developmental disabilities and

17         cognitive challenges/disorders.  This team shall

18         assume some of the functions of the positive

19         behavior support teams if the individuals they

20         serve also need positive behavior supports.

21     e.  Each State Hospital shall develop and implement a

22         Behavioral Consultation Committee, chaired by the

23         Chief of Psychology, and co-chaired by the Chief of

24         Psychiatry, to review the WRP and maladaptive

25         behavior(s) of individuals who have not made timely

26         progress on positive behavior support plans.  The

27         Chief of Psychology is responsible for the

28         functions of this committee, together with members

48

of the positive behavior support team (in functions
of the committee that relate to individuals under
the care of those team members).  The committee
membership shall include all clinical discipline
heads, including the medical director, as well as
the clinical administrator of the facility.

f.  Each State Hospital shall ensure that it has
sufficient neuropsychological services for the
provision of adequate neuropsychological assessment
of individuals with persistent mental illness.

g.  All clinical psychologists with privileges at any
State Hospital shall have the authority to write
orders for the implementation of positive behavior
support plans, consultation for educational or
other testing, and behavior plan updates.

3.  Nursing Services

Each State Hospital shall provide adequate and
appropriate nursing care and services consistent with
generally accepted professional standards of care to
individuals who require such services.

a.  Each State Hospital shall develop and implement
policies and protocols regarding the administration
of medication, including pro re nata ("PRN") and
"Stat" medication (i.e., emergency use of
psychoactive medication), consistent with generally
accepted professional standards of care, to ensure:

i.    safe administration of PRN medications and
Stat medications;

49

1        ii.    documentation of the circumstances requiring

2               PRN and Stat administration of medications;

3               and

4        iii.   documentation of the individual's response to

5               PRN and Stat medication.

6    b.  Each State Hospital shall ensure that all failures

7        to properly sign the Medication and Treatment

8        Record ("MTR") or the controlled medication log are

9        treated as medication variances, and that

10       appropriate follow-up occurs to prevent recurrence

11       of such variances.

12   c.  Each State Hospital shall ensure that all nursing

13       interventions are fully integrated into the

14       therapeutic and rehabilitation service plan and

15       that nursing interventions are written in a manner

16       aligned with the rest of the interventions in the

17       therapeutic and rehabilitation service plan, in

18       particular, in observable, behavioral, and/or

19       measurable terms.  No nursing care plans other than

20       the nursing interventions integrated in the

21       therapeutic and rehabilitation service plan are

22       required.  No nursing diagnoses other than as

23       specified in the therapeutic and rehabilitation

24       service plan, in terms of the current DSM criteria,

25       are required.

26   d.  All nursing staff working with an individual shall

27       be familiar with the goals, objectives, and

28       interventions for that individual.

                          50

1    e.  Each State Hospital shall ensure that nursing staff
2        timely monitor, document and report the status of
3        symptoms, target variables, health, and mental
4        health status of individuals in a manner that
5        enables interdisciplinary teams to assess each
6        individual's status and respond to interventions,
7        and to modify, as appropriate, individuals'
8        therapeutic and rehabilitation service plans.  Each
9        State Hospital shall ensure that all nursing shift
10       changes include a review of changes in status of
11       individuals on the unit.
12   f.  Each State Hospital shall develop and implement a
13       system to monitor nursing staff while administering
14       medication to ensure that:
15       i.   nursing staff are knowledgeable regarding
16            each individual's prescribed medications;
17       ii.  education is provided to individuals during
18            medication administration;
19       iii. nursing staff are following the appropriate
20            medication administration protocol; and
21       iv.  medication administration is documented in
22            accordance with the appropriate medication
23            administration protocol.
24   g.  Each State Hospital shall ensure that individuals
25       remain in a "bed-bound" status only for clinically
26       justified reasons.
27   h.  Each State Hospital shall ensure that, before they
28       work directly with individuals, all nursing and

51

1       psychiatric technicians have successfully completed

2       competency-based training regarding:

3           i.     mental health diagnoses, related symptoms,

4                  psychotropic medications and their side

5                  effects, monitoring of symptoms and target

6                  variables, and documenting and reporting of

7                  the individual's status;

8           ii.    the provision of a therapeutic milieu on the

9                  units and proactive, positive interventions

10                 to prevent and de-escalate crises; and

11          iii.   positive behavior support principles.

12      i.   Each State Hospital shall ensure that, prior to

13           assuming their duties and on a regular basis

14           thereafter, all staff responsible for the

15           administration of medication have successfully

16           completed competency-based training on the

17           completion of the MTR and the controlled medication

18           log.

19  4.   Rehabilitation Therapy Services

20      Each State Hospital shall provide adequate,

21  appropriate, and timely rehabilitation therapy services to

22  each individual in need of such services, consistent with

23  generally accepted professional standards of care.

24      a.   Each State Hospital shall develop and implement

25           policies and procedures, consistent with generally

26           accepted professional standards of care, related to

27           the provision of rehabilitation therapy services

28           that address, at a minimum:

52

1

2              i.      the provision of direct services by

3                      rehabilitation therapy services staff; and

4              ii.     the oversight by rehabilitation therapists of

5                      individualized physical therapy programs

6                      implemented by nursing staff.

7          b.  Each State Hospital shall provide competency-based

8              training to nursing staff, as appropriate, on the

9              use and care of adaptive equipment, transferring,

10             and positioning, as well as the need to promote

11             individuals' independence.

12         c.  Each State Hospital shall ensure that individuals

13             are provided with timely and adequate

14             rehabilitation therapy services.

15         d.  Each State Hospital, consistent with generally

16             accepted professional standards of care, shall

17             ensure that each individual who requires adaptive

18             equipment is provided with equipment that meets

19             his/her assessed needs and promotes his/her

20             independence, and shall provide individuals with

21             training and support to use such equipment.

22    5.    Nutrition Services

23         Each State Hospital shall provide the individuals it

24    serves, particularly those experiencing weight-related

25    problems, adequate and appropriate dietary services

26    consistent with generally accepted professional standards of

27    care.

28

53

a. Each State Hospital shall modify policies and
procedures to require that the therapeutic and
rehabilitation service plans of individuals who
experience weight problems and/or related health
concerns include adequate strategies and
methodologies to address the identified problems
and that such strategies and methodologies are
implemented in a timely manner, monitored
appropriately, and revised, as warranted,
consistent with generally accepted professional
standards of care.

b. Each State Hospital shall ensure that one or more
treatment team members demonstrate competence in
the dietary and nutritional issues affecting the
individuals they serve and the development and
implementation of strategies and methodologies to
address such issues.

c. Each State Hospital shall develop and implement
policies and procedures to address the needs of
individuals who are at risk for aspiration or
dysphagia, including but not limited to, the
development and implementation of assessments and
interventions for mealtimes and other activities
involving swallowing.

d. Each State Hospital shall ensure that staff with
responsibilities for assessments and interventions
regarding aspiration and dysphagia have

54

1          successfully completed competency-based training
2          commensurate with their responsibilities.
3       e.  Each State Hospital shall develop and implement
4          policies and procedures requiring treatment of the
5          underlying causes for tube feeding placement, and
6          ongoing assessment of the individuals for whom
7          these treatment options are utilized, to determine
8          the feasibility of returning them to oral intake
9          status.
10   6.   Pharmacy Services
11       Each State Hospital shall provide adequate and
12   appropriate pharmacy services consistent with generally
13   accepted professional standards of care.  Each State
14   Hospital shall develop and implement policies and procedures
15   that require:
16       a.  Upon the prescription of a new medication,
17          pharmacists to conduct reviews of each individual's
18          medication regimen and, as appropriate, make
19          recommendations to the prescribing physician about
20          possible drug-to-drug interactions, side effects,
21          and needs for laboratory work and testing; and
22       b.  Physicians to consider pharmacists'
23          recommendations, and for any recommendations not
24          followed, document in the individual's medical
25          record an adequate clinical justification.
26   7.   General Medical Services
27       a.  Each State Hospital shall provide adequate,
28          appropriate, and timely preventive, routine,

55

1          specialized, and emergency medical care to all

2          individuals in need of such services, consistent

3          with generally accepted professional standards of

4          care.  Each State Hospital shall ensure that

5          individuals with medical problems are promptly

6          identified, assessed, diagnosed, treated, monitored

7          and, as monitoring indicates is necessary,

8          reassessed, diagnosed, and treated, consistent with

9          generally accepted professional standards of care.

10    b.   Each State Hospital shall develop and implement

11         protocols and procedures, consistent with generally

12         accepted professional standards of care, that:

13         i.    require the timely provision of initial and

14               ongoing assessments relating to medical care,

15               including but not limited to, vision care,

16               dental care, and laboratory and consultation

17               services;

18         ii.   require the timely provision of medical care,

19               including but not limited to, vision care,

20               dental care, and laboratory and consultation

21               services; timely and appropriate

22               communication between nursing staff and

23               physicians regarding changes in an

24               individual's physical status; and the

25               integration of each individual's mental

26               health and medical care;

27         iii.  define the duties and responsibilities of

28               primary care (non-psychiatric) physicians;

56

1    iv.    ensure a system of after-hours coverage by
2           primary care physicians with formal
3           psychiatric training (i.e., privileging and
4           proctorship) and psychiatric backup support
5           after hours; and
6    v.     endeavor to obtain, on a consistent and
7           timely basis, an individual's medical records
8           after the individual is treated in another
9           medical facility.
10   c.    Each State Hospital shall ensure that physicians
11         monitor each individual's health status indicators
12         in accordance with generally accepted professional
13         standards of care, and, whenever appropriate,
14         modify their therapeutic and rehabilitation service
15         plans to address any problematic changes in health
16         status indicators.
17   d.    Each State Hospital shall monitor, on a continuous
18         basis, outcome indicators to identify trends and
19         patterns in individuals' health status, assess the
20         performance of medical systems, and provide
21         corrective follow-up measures to improve outcomes.
22  8.    Infection Control
23        Each State Hospital shall develop and implement
24   infection control policies and procedures to prevent the
25   spread of infections or communicable diseases, consistent
26   with generally accepted professional standards of care.
27   a.    Each State Hospital shall establish an effective
28         infection control program that:

57

1            i.    actively collects data regarding infections

2                   and communicable diseases;

3           ii.   assesses these data for trends;

4          iii.  initiates inquiries regarding problematic

5                   trends;

6           iv.   identifies necessary corrective action;

7           v.    monitors to ensure that appropriate remedies

8                   are achieved; and

9           vi.   integrates this information into the State

10                  Hospital's quality assurance review.

11   9.    Dental Services

12       Each State Hospital shall provide individuals with

13   adequate, appropriate and timely routine and emergency

14   dental care and treatment, consistent with generally

15   accepted professional standards of care.

16       a.  Each State Hospital shall retain or contract with

17          an adequate number of qualified dentists to provide

18          timely and appropriate dental care and treatment to

19          all individuals it serves;

20       b.  Each State Hospital shall develop and implement

21          policies and procedures that require:

22          i.   comprehensive and timely provision of dental

23              services;

24          ii.  documentation of dental services, including

25              but not limited to, findings, descriptions of

26              any treatment provided, and the plans of

27              care;

28

1     iii. use of preventive and restorative care

2       whenever possible; and

3     iv. tooth extractions be used as a treatment of

4       last resort, which, when performed, shall be

5       justified in a manner subject to clinical

6       review.

7   c. Each State Hospital shall ensure that dentists

8    demonstrate, in a documented fashion, an accurate

9    understanding of individuals' physical health,

10    medications, allergies, and current dental status

11    and complaints.

12   d. Each State Hospital shall ensure that

13    transportation and staffing issues do not preclude

14    individuals from attending dental appointments, and

15    individuals' refusals are addressed to facilitate

16    compliance.

17   e. Each State Hospital shall ensure that

18    interdisciplinary teams review, assess, and develop

19    strategies to overcome individuals' refusals to

20    participate in dental appointments.

21 10. Special Education

22  Each State Hospital shall provide the school-age and

23 other residents, as required by law, who qualify for special

24 education ("students"), individualized educational programs

25 that are reasonably calculated to enable these students to

26 receive educational benefits, as defined by applicable law.

27   a. Each State Hospital shall develop and implement

28    uniform systems for assessing students' individual

1           educational needs and monitoring their individual

2           progress.

3       b.  Each State Hospital shall ensure that all

4           Individual Education Plans ("IEPs") are developed

5           and implemented consistent with the Individuals

6           with Disabilities Education Act, 20 U.S.C. § 1400

7           et seq. (2002) ("IDEA").

8       c.  Each State Hospital shall ensure that teachers

9           providing instruction to students at the State

10          Hospital have completed competency-based training

11          regarding teaching and academic instruction,

12          behavioral interventions, monitoring of academic

13          and behavioral progress, and incident management

14          and reporting.

15      d.  Each State Hospital shall ensure that students

16          receive instruction and behavioral supports

17          appropriate to their learning abilities and needs,

18          consistent with generally accepted professional

19          standards of care.

20      e.  Each State Hospital shall provide appropriate

21          literacy instruction, consistent with generally

22          accepted professional standards of care, for

23          students who show deficits in one or more common

24          areas of reading (e.g., decoding or comprehending).

25      f.  Each State Hospital shall, on admission and as

26          statutorily required thereafter, assess each

27          student's capacity to participate, with appropriate

28          supports and services, in an integrated, non-

60

1           institutional, education environment, and provide

2           access to an integrated education environment for

3           those students who can participate in one with

4           appropriate supports and services.  Each State

5           Hospital shall ensure that all students receive

6           their education in the least restrictive setting

7           pursuant to the requirements of the IDEA,

8           consistent with their legal and clinical status.

9 G.   Documentation

10     Each State Hospital shall ensure that an individual's

11 records accurately reflect the individual's response to all

12 treatment, rehabilitation and enrichment activities identified in

13 the individual's therapeutic and rehabilitation service plan,

14 including for children and adolescents, their education plan,

15 consistent with generally accepted professional standards of

16 care.  Each State Hospital shall develop and implement policies

17 and procedures setting forth clear standards regarding the

18 content and timeliness of progress notes, transfer notes, school

19 progress notes, and discharge notes, including, but not limited

20 to, an expectation that such records include meaningful,

21 accurate, and coherent assessments of the individual's progress

22 relating to treatment plans and treatment goals, and that

23 clinically relevant information remains readily accessible.

24 H.   Restraints, Seclusion, and PRN and Stat Medications

25     Each State Hospital shall ensure that restraints, seclusion,

26 psychiatric PRN medications, and Stat medications are used

27 consistent with generally accepted professional standards of

28 care.

1    1.   Each State Hospital shall revise, as appropriate, and

2        implement policies and procedures regarding the use of

3        seclusion, restraints, psychiatric PRN medications, and

4        Stat medications consistent with generally accepted

5        professional standards of care.  In particular, the

6        policies and procedures shall expressly prohibit the

7        use of prone restraints, prone containment and prone

8        transportation and shall list the types of restraints

9        that are acceptable for use.

10   2.   Each State Hospital shall ensure that restraints and

11       seclusion:

12       a.  Are used in a documented manner and only when

13           individuals pose an imminent danger to self or

14           others and after a hierarchy of less restrictive

15           measures has been considered in a clinically

16           justifiable manner or exhausted;

17       b.  Are not used in the absence of, or as an

18           alternative to, active treatment, as punishment, or

19           for the convenience of staff;

20       c.  Are not used as part of a behavioral intervention;

21           and

22       d.  Are terminated as soon as the individual is no

23           longer an imminent danger to self or others.

24   3.   Each State Hospital shall comply with 42 C.F.R.

25       § 483.360(f), requiring assessments by a physician or

26       licensed clinical professional of any individual placed

27       in seclusion or restraints within 1 hour.  Each State

28       Hospital shall also ensure that any individual placed

62

1           in seclusion or restraints is continuously monitored by

2           a staff person who has successfully completed

3           competency-based training on the administration of

4           seclusion and restraints.

5      4.   Each State Hospital shall ensure the accuracy of data

6           regarding the use of restraints, seclusion, psychiatric

7           PRN medications, or Stat medications.

8      5.   Each State Hospital shall revise, as appropriate, and

9           implement policies and procedures to require the review

10          within 3 business days of individuals' therapeutic and

11          rehabilitation service plans for any individuals placed

12          in seclusion or restraints more than 3 times in any

13          4-week period, and modification of therapeutic and

14          rehabilitation service plans, as appropriate.

15     6.   Each State Hospital shall develop and implement

16          policies and procedures consistent with generally

17          accepted professional standards of care governing the

18          use of psychiatric PRN medication and Stat medication,

19          requiring that:

20          a.  Such medications are used in a manner that is

21              clinically justified and are not used as a

22              substitute for adequate treatment of the underlying

23              cause of the individual's distress; and

24          b.  PRN medications, other than for analgesia, are

25              prescribed for specified and individualized

26              behaviors;

27          c.  PRN medications are appropriately time-limited;

28

                                63

1        d.   Nursing staff assess the individual within 1 hour

2             of the administration of the psychiatric PRN

3             medication and Stat medication and documents the

4             individual's response; and  A psychiatrist conducts

5             a face-to-face assessment of the individual within

6             24 hours of the administration of a Stat

7             medication.  The assessment shall address the

8             reason for the Stat administration, the

9             individual's response, and, as appropriate,

10            appropriateness of adjustment to current treatment

11            and/or diagnosis.

12   7.   Each State Hospital shall ensure that all staff whose

13        responsibilities include the implementation or

14        assessment of seclusion, restraints, psychiatric PRN

15        medications, or Stat medications successfully complete

16        competency-based training regarding implementation of

17        all such policies and the use of less restrictive

18        interventions.

19   8.   Each State Hospital shall:

20        a.   Develop and implement a plan to reduce the use of

21             side rails as restraints in a systematic and

22             gradual way to ensure individuals' safety; and

23        b.   Ensure that, as to individuals who need side rails,

24             their therapeutic and rehabilitation service plans

25             expressly address the use of side rails, including

26             identification of the medical symptoms that warrant

27             the use of side rails, methods to address the

28             underlying causes of such medical symptoms, and

64

1              strategies to reduce the use of side rails, if
2              appropriate.
3  I.    Protection From Harm

4      Each State Hospital shall provide the individuals it serves
5  with a safe and humane environment and ensure that these
6  individuals are protected from harm.

7      1.    Incident Management

8          Each State Hospital shall develop and implement across
9      all settings, including school settings, an integrated
10     incident management system that is consistent with generally
11     accepted professional standards of care.

12          a.    Each State Hospital shall review, revise, as
13                appropriate, and implement incident management
14                policies, procedures and practices that are
15                consistent with generally accepted professional
16                standards of care.  Such policies, procedures and
17                practices shall require:
18                i.    that the State Hospital not tolerate abuse or
19                      neglect of individuals and that staff are
20                      required to report abuse or neglect of
21                      individuals;
22                ii.   identification of the categories and
23                      definitions of incidents to be reported and
24                      investigated; immediate reporting by staff to
25                      supervisory personnel and the State
26                      Hospital's executive director (or that
27                      official's designee) of serious incidents,
28

65

1          including but not limited to, death, abuse,

2          neglect, and serious injury, using

3          standardized reporting across all settings,

4          including school settings;

5     iii.   mechanisms to ensure that when serious

6          incidents such as allegations of abuse,

7          neglect, and/or serious injury occur, staff

8          take immediate and appropriate action to

9          protect the individuals involved, including

10         removing alleged perpetrators from direct

11         contact with the involved individuals pending

12         the outcome of the facility's investigation;

13    iv.   adequate competency-based training for all

14         staff on recognizing and reporting potential

15         signs and symptoms of abuse or neglect,

16         including the precursors that may lead to

17         abuse;

18     v.   notification of all staff when commencing

19         employment and adequate training thereafter

20         of their obligation to report abuse or

21         neglect to the State Hospital and state

22         officials.  All staff persons who are

23         mandatory reporters of abuse or neglect shall

24         sign a statement that shall be kept with

25         their personnel records evidencing their

26         recognition of their reporting obligations.

27         Each State Hospital shall not tolerate any

28

66

1                     mandatory reporter's failure to report abuse

2                     or neglect;

3     vi.   mechanisms to inform individuals and their

4                     conservators how to identify and report

5                     suspected abuse or neglect;

6     vii.  posting in each living unit and day program

7                     site a brief and easily understood statement

8                     of individuals' rights, including information

9                     about how to pursue such rights and how to

10                    report violations of such rights;

11    viii. procedures for referring, as appropriate,

12                    allegations of abuse or neglect to law

13                    enforcement; and

14     ix.   mechanisms to ensure that any staff person,

15                    individual, family member or visitor who in

16                    good faith reports an allegation of abuse or

17                    neglect is not subject to retaliatory action,

18                    including but not limited to reprimands,

19                    discipline, harassment, threats or censure,

20                    except for appropriate counseling, reprimands

21                    or discipline because of an employee's

22                    failure to report an incident in an

23                    appropriate or timely manner.

24    b.  Each State Hospital shall review, revise, as

25               appropriate, and implement policies and procedures

26               to ensure the timely and thorough performance of

27               investigations, consistent with generally accepted

28               professional standards of care.  Such policies and

1    procedures shall:

2        i.    require investigations of all deaths, as well

3              as allegations of abuse, neglect, serious

4              injury, and theft.   The investigations shall

5              be conducted by qualified investigators who

6              have no reporting obligations to the program

7              or elements of the facility associated with

8              the allegation and have expertise in

9              conducting investigations and working with

10             persons with mental disorders;

11       ii.   ensure that only the State Hospital staff who

12             have successfully completed competency-based

13             training on the conduct of investigations be

14             allowed to conduct investigations of

15             allegations of petty theft and all other

16             unusual incidents;

17       iii.  for investigations required by paragraph

18             I.1.b.i, above, provide for the safeguarding

19             of evidence; and

20       iv.   for investigations required by paragraph

21             I.1.b.i, above, require the development and

22             implementation of standardized procedures and

23             protocols for the conduct of investigations

24             that are consistent with generally accepted

25             professional standards.   Such procedures and

26             protocols shall require that:

27

28

68

1                1)   investigations commence within 24 hours

2                       or sooner, if necessary, of the incident

3                       being reported;

4                2)   investigations be completed within 30

5                       business days of the incident being

6                       reported, except that investigations

7                       where material evidence is unavailable to

8                       the investigator, despite best efforts,

9                       may be completed within 5 business days

10                      of its availability;

11              3)   each investigation result in a written

12                     report, including a summary of the

13                     investigation, findings and, as

14                     appropriate, recommendations for

15                     corrective action.  The report's contents

16                     shall be sufficient to provide a clear

17                     basis for its conclusion.  The report

18                     shall set forth explicitly and

19                     separately:

20                    (i)    each allegation of wrongdoing

21                         investigated;

22                  (ii)   the names of all witnesses;

23                  (iii) the names of all alleged victims

24                         and perpetrators;

25                  (iv)  the names of all persons

26                         interviewed during the

27                         investigation;

28                  (v)    a summary of each interview;

69

1          (vi)    a list of all documents reviewed

2                  during the investigation;

3          (vii)   sources of evidence considered,

4                  including previous investigations

5                  and their results, involving the

6                  alleged victim(s) and

7                  perpetrator(s);

8          (viii)  the investigator's findings,

9                  including findings related to the

10                 substantiation of the allegations

11                 as well as findings about staff's

12                 adherence to programmatic

13                 requirements; and

14         (ix)    the investigator's reasons for

15                 his/her conclusions, including a

16                 summary indicating how potentially

17                 conflicting evidence was

18                 reconciled; and

19    4)   staff supervising investigations review

20         the written report, together with any

21         other relevant documentation, to ensure

22         that the investigation is thorough and

23         complete and that the report is accurate,

24         complete, and coherent.  Any deficiencies

25         or areas of further inquiry in the

26         investigation and/or report shall be

27         addressed promptly.  As necessary, staff

28         responsible for investigations shall be

70

1          provided with additional training and/or
2          technical assistance to ensure the
3          completion of investigations and
4          investigation reports consistent with
5          generally accepted professional standards
6          of care.

7     c.   Each State Hospital shall ensure that whenever
8          disciplinary or programmatic action is necessary to
9          correct a situation or prevent reoccurrence, each
10         State Hospital shall implement such action promptly
11         and thoroughly, and track and document such actions
12         and the corresponding outcomes.

13    d.   Each State Hospital shall have a system to allow
14         the tracking and trending of investigation results.
15         Trends shall be tracked by at least the following
16         categories:

17         i.    type of incident;

18         ii.   staff involved and staff present;

19         iii.  individuals directly and indirectly involved;

20         iv.   location of incident;

21         v.    date and time of incident;

22         vi.   cause(s) of incident; and

23         vii.  outcome of investigation.

24    e.   Each State Hospital shall ensure that before
25         permitting a staff person to work directly with any
26         individual, the State Hospital shall investigate
27         the criminal history and other relevant background
28         factors of that staff person, whether full-time or

71

1          part-time, temporary or permanent, or a person who

2          volunteers on a regular basis.  Facility staff

3          shall directly supervise volunteers for whom an

4          investigation has not been completed when they are

5          working directly with individuals living at the

6          facility.  The facility shall ensure that a staff

7          person or volunteer may not interact with

8          individuals at the State Hospital in instances

9          where the investigation indicates that the staff

10         person or volunteer may pose a risk of harm to such

11         individuals.

12    2.    Performance Improvement

13         Each State Hospital shall develop, revise as

14    appropriate, and implement performance improvement

15    mechanisms that enable it to comply fully with this Plan, to

16    detect timely and adequately problems with the provision of

17    protections, treatment, rehabilitation, services and

18    supports, and to ensure that appropriate corrective steps

19    are implemented.  Each State Hospital shall establish a risk

20    management process to improve the identification of

21    individuals at risk and the provision of timely

22    interventions and other corrective actions commensurate with

23    the level of risk.  The performance improvement mechanisms

24    shall be consistent with generally accepted professional

25    standards of care and shall include:

26         a.    Mechanisms for the proper and timely identification

27               of high-risk situations of an immediate nature as

28               well as long-term systemic problems.  These

72

mechanisms shall include, but not be limited to:

    i.    data collection tools and centralized databases to capture and provide information on various categories of high-risk situations;

    ii.    establishment of triggers and thresholds that address different levels of risk, as set forth in Appendix A of this Plan; and

    iii.    identification of systemic trends and patterns of high risk situations;

b.  Mechanisms for timely interventions and other corrective actions by teams and disciplines to prevent or minimize risk of harm to individuals. These mechanisms shall include, but not be limited to:

    i.    a hierarchy of interventions by clinical teams that correspond to triggers and thresholds;

    ii.    timely corrective actions by teams and/or disciplines to address systemic trends and patterns;

    iii.    formalized systems for the notification of teams and needed disciplines to support appropriate interventions and other corrective actions;

    iv.    formalized systems for feedback from teams and disciplines to the standards compliance department regarding completed actions; and

73

1          v.    monitoring and oversight systems to support

2                timely implementation of interventions and

3                corrective actions and appropriate follow up;

4                and

5     c.  Utilize, on an ongoing basis, appropriate

6          performance improvement mechanisms to assess and

7          address the facility's compliance with its

8          identified service goals.

9   3.   Environmental Conditions

10      Each State Hospital shall develop and implement a

11  system to review regularly all units and areas of the

12  hospital to which individuals being served have access to

13  identify any potential environmental safety hazards and to

14  develop and implement a plan to remedy any identified

15  issues, consistent with generally accepted professional

16  standards of care.  Such a system shall require that:

17      a.  Potential suicide hazards are identified and

18          prioritized for systematic corrective action, and

19          that such action is implemented on a priority basis

20          as promptly as feasible;

21      b.  All areas of the hospital that are occupied by

22          individuals being served have adequate temperature

23          control and deviations shall be promptly corrected;

24      c.  Each State Hospital reviews, revises, as

25          appropriate, and implements procedures and

26          practices so that individuals who are incontinent

27          are assisted to change in a timely manner;

28

74

1    d.    Each State Hospital thoroughly reviews and revises,

2          as appropriate, its policy and practice regarding

3          sexual contact among individuals served at the

4          hospital.  Each State Hospital shall establish

5          clear guidelines regarding staff response to

6          reports of sexual contact and monitor staff

7          response to incidents.  Each State Hospital

8          documents comprehensively therapeutic interventions

9          in the individual's charts in response to instances

10         of sexual contact;

11   e.    Each State Hospital develops and implements clear

12         guidelines stating the circumstances under which it

13         is appropriate to utilize staff who are not trained

14         to provide mental health services in addressing

15         incidents involving individuals.  Each State

16         Hospital ensures that persons who are likely to

17         intervene in incidents are properly trained to work

18         with individuals with mental health concerns; and

19   f.    Metropolitan State Hospital will institute roving

20         patrols of treatment units, except for the skilled

21         nursing facility, by Hospital Police Officers on a

22         schedule and frequency to be determined by the

23         hospital administration.

24   J.   First Amendment and Due Process

25        Each State Hospital unconditionally permits individuals to

26   exercise their constitutional rights of free speech, including

27   the right to petition the government for redress of grievances

28   without state monitoring and provides them due process.

75

**ENHANCEMENT PLAN - APPENDIX A**

| Trigger | Thresholds |
|---------|-----------|
| Aggressive Act to Self | 1.1  Any aggression to self resulting in major injury*<br>1.2  2 or more aggressive acts to self in 7 consecutive days<br>1.3  4 or more aggressive acts to self in 30 consecutive days |
| Aggressive Act to Others | 2.1  Any peer-to-peer aggression resulting in major injury<br>2.2  Any aggression to staff resulting in major injury<br>2.3  2 or more aggressive acts to others in 7 consecutive days<br>2.4  4 or more aggressive acts to others in 30 |
| Alleged Abuse/ Neglect/Exploitation | 3.1  Any alleged abuse/neglect/exploitation if minor** or major injury |

76

| Body Weight | 4.1 | Body Mass Index (BMI) of 18.5 or less (underweight) |
| | 4.2 | Body Mass Index (BMI) between 25 and 29.9      (overweight) |
| | 4.3 | Body Mass Index (BMI) between 30 and 34.9      (Obesity-Grade I) |
| | 4.4 | Body Mass Index (BMI) between 35 and 39.9      (Obesity-Grade II) |
| | 4.5 | Body Mass Index (BMI) 40 or above (Obesity-Grade III) |
| | 4.6 | Weight Change $\pm$ 5% in 1 month |
| | 4.7 | Weight Change $\pm$ 7.5% in 3 months |
| | 4.8 | Weight Change $\pm$ 10% in 6 months |
| | 4.9 | Waist Circumference over 35" for females or over 40" for males |
| Combined Pharmacotherapy | 5.1 | More than 2 intra-class psychotropic medications for psychiatric reasons |
| | 5.2 | More than 3 inter-class psychotropic medications for psychiatric reasons |

77

| | | |
|---|---|---|
| Escape/AWOL | 6.1 | Any escape attempt/unauthorized absence within facility |
| | 6.2 | Any escape attempt/unauthorized absence outside of facility |
| Falls | 7.1 | Any fall resulting in major injury |
| | 7.2 | Three or more falls in 30 consecutive days |
| Illicit Substances | 8.1 | Any incident of an individual testing positive for illicit substance (street drug) use |
| Medication Variance (Error) | 9.1 | Any medication error that results in major injury or exacerbation of a disease or disorder (i.e., prescribing, transcribing, ordering/procurement, dispensing/storage, administration, and documentation) |

78

| | | |
|---|---|---|
| Mortality | 10.1 | Expected deaths |
| | 10.2 | Unexpected deaths |
| Non-Adherence to Wellness and Recovery Plan (WRP) | 11.1 | Non-adherence to WRP for more than 20% of the interventions in 7 consecutive days (Note: For children and adolescents: include non-attendance at school for more than 20% of the time in 7 consecutive days) |
| One-to-One Observations | 12.1 | 1:1 for psychiatric/behavioral reasons over 24 hours in 7 consecutive days |
| | 12.2 | Any 2:1 for psychiatric/behavioral reasons |
| PRN Medications | 13.1 | 2 PRNs in 24 hours (for psychiatric/behavioral reasons) |
| | 13.2 | 3 PRNs in 7 consecutive days |
| | 13.3 | 15 PRNs in 30 consecutive days |

| Restraint | 14.1 Restraint for more than 4 hours for adults (Note: more than 4 hours for adolescents and 2 hours for  children) |
| | 14.2 More than 3 episodes of restraint in 7 consecutive days |
| | 14.3 More than 5 episodes of restraint in 30 consecutive days |
| Seclusion | 15.1 Seclusion for more than 4 hours for adults (Note: more than 4 hours for adolescents and 2 hours for  children) |
| | 15.2 More than 3 episodes of seclusion in 7 consecutive days |
| | 15.3 More than 5 episodes of seclusion in 30 consecutive days |
| Stat Medications | 16.1 2 Stat medications in 24 hours |
| | 16.2 3 Stat medications in 7 consecutive days |
| | 16.3 15 Stat med in 30 consecutive days |

| 1 | | |
|---|---|---|
| 2 | Suicide Attempt | 17.1 Any suicide attempt |
| 3 | | 17.2 Any suicide threat or ideations |
| 4 | | |

\* A major injury is an injury that requires treatment of more than basic first aid by medical personnel or any injury resulting from alleged or suspected abuse or any injury judged to have potential for serious harm.

\*\* A minor injury is any injury, other than an injury caused by alleged or suspected abuse, that requires no treatment or only minor first aid and for which the potential for serious harm is judged to have been remote.

1                               **PART II**

2                         **ENFORCEMENT**

3 A.   Selection of Monitor

4     Mohamed El-Sabaawi, M.D. shall be appointed as the expert to

5 monitor the State's implementation of this Agreement (the

6 "Monitor").  The Monitor shall have full authority to assess,

7 review, and report independently on the Defendants'

8 implementation of and compliance with the provisions of the

9 Agreement.  No Party, nor any employee or agent of any Party,

10 shall have any supervisory authority over the Monitor's

11 activities, reports, findings, or recommendations.  In the event

12 that Dr. El-Sabaawi is unable to serve or continue serving as the

13 Monitor, or in the event that the Parties for any reason agree to

14 discontinue the use of Dr. El-Sabaawi, the Parties shall meet or

15 otherwise confer within thirty (30) days of being notified of the

16 incapacity or the decision to discontinue use of Dr. El-Sabaawi

17 to select a new Monitor.  If the Parties are unable to agree upon

18 a selection, each Party shall submit two names, along with

19 resumes or curricula vitae and cost proposals, to the Court and

20 the Court shall appoint the Monitor from among the names

21 submitted.  The procedure described in this paragraph shall apply

22 to all successor Monitors.  The Parties agree that the Monitor

23 may use consultants to assist the Monitor.  Any such consultants

24 shall be paid for time, services, and expenses pursuant to the

25 Monitor's existing budget.  In collaboration with the Monitor,

26 the Parties shall meet or otherwise confer whenever necessary to

27 agree upon which particular consultant(s) the Monitor shall use

28 to assist the Monitor in his duties as Monitor.

1  B.    Budget of the Monitor

2        The Parties and the Monitor have agreed upon the annual

3  budget for the Monitor's work.

4  C.    Reimbursement and Payment Provisions

5        1.    The cost of the Monitor, including the cost of any

6              consultant to assist the Monitor, shall be borne by the

7              State in this action.  All reasonable expenses incurred

8              by the Monitor or any consultant, in the course of the

9              performance of the duties of the Monitor, pursuant to

10             the budget of the Monitor, shall be reimbursed by the

11             State.  The United States will bear its own expenses in

12             this matter.

13       2.    The Monitor shall submit monthly invoices to the

14             Defendants, with a copy to the United States, detailing

15             all expenses the Monitor incurred during the prior

16             month.  These invoices shall include daily records of

17             time spent and expenses incurred, and shall include

18             copies of any supporting documentation, including

19             receipts.  The Defendants agrees to pay each month's

20             invoice in full from the Monitor within thirty (30)

21             days of receipt of the monthly invoice from the

22             Monitor.  If the Defendants dispute all or part of the

23             invoice, the Defendants shall notify in writing the

24             Monitor and the United States within ten days of

25             receipt of the Monitor's monthly invoice.  The Monitor,

26             the Defendants and the United States will endeavor to

27             resolve any invoice disputes promptly and in good

28             faith.  Where the Monitor and the Parties are unable to

83

1          resolve any invoice dispute, the Monitor and/or the

2          Parties may petition the Court to resolve the dispute.

3  D.  Responsibilities and Powers of the Monitor

4      1.  The overall duties of the Monitor shall be to observe,

5          review, report findings, and make recommendations,

6          where appropriate, with regard to the implementation of

7          the foregoing Enhancement Plan at the State Hospitals.

8          The Monitor shall regularly review the therapeutic and

9          rehabilitation services provided to individuals to

10          determine the Defendants' implementation of and

11          compliance with this Consent Judgment.  During the

12          Monitor's review, the Monitor shall have full and

13          complete access to all of the State Hospitals'

14          buildings and facilities, staff, patients, patient

15          records, documentation, and information relating to the

16          issues addressed in this Consent Judgment.  The State

17          Hospitals' Executive Directors shall direct all

18          employees to cooperate fully with the Monitor.  The

19          Monitor shall be permitted to initiate and receive ex

20          parte communications with the Parties.  The Monitor

21          shall devote such time as is necessary to fulfill the

22          purposes of the duties and responsibilities of the

23          Monitor pursuant to this Consent Judgment.

24      2.  The Monitor shall consult with the Parties and shall

25          submit a written plan with regard to the methodologies

26          to be used by the Monitor to assess the Defendants'

27          compliance with and implementation of the Consent

28          Judgment.  The Monitor's evaluation shall include:

84

1          regular on-site inspection of the State Hospitals'
2          facilities and programs for patients, interviews with
3          administrators, professional and other staff,
4          contractors, and patients, and detailed review of
5          pertinent documents and patient records.  The Parties
6          envision that the Monitor may provide specific
7          recommendations to the Defendants with regard to steps
8          to be taken to come into compliance with the Consent
9          Judgment.  However, the Defendants retain the
10         discretion to achieve compliance by any legal means
11         available to them, and may choose to utilize methods
12         other than those that may be proposed by the Monitor or
13         the United States.  The Monitor shall not be empowered
14         to direct the Defendants to take, or to refrain from
15         taking, any specific action to achieve compliance with
16         the Consent Judgment.  The Parties do not intend for
17         the Monitor to have the role of a "Special Master."
18         The Agreement is the product of two governmental
19         agencies exercising their expertise.

20    3.   In any instance in which either party disagrees as to
21         compliance, the Court shall give appropriate deference
22         to the Monitor's assessment of compliance.

23    4.   The Parties envision that the United States and the
24         Monitor shall conduct a "baseline" evaluation of the
25         Defendants' compliance with the terms of this Consent
26         Judgment at the State Hospitals within the first 180
27         days after the filing of this Consent Judgment.  This
28         initial baseline evaluation is intended to inform the

85

1     Parties and the Monitor of the status of compliance

2     with this Enhancement Plan. The Monitor shall produce

3     a written report to the Parties with regard to the

4     State's compliance with particular provisions of the

5     Consent Judgment as soon as possible, but at least

6     within 60 days of each visit.

7  5. Following the baseline tour, the Monitor shall conduct

8     subsequent tours of each State Hospital at least

9     semi-annually, upon reasonable notice to the State

10    Hospital, in order to fulfill his or her obligations

11    pursuant to this Consent Judgment. In connection with

12    the baseline tours, the Parties and the Monitor shall

13    attempt to agree upon a schedule of subsequent tours

14    and reports for the upcoming year, to be repeated

15    annually thereafter.

16 6. The Monitor shall provide the Parties with a written

17    report as soon as possible, but at least within 60 days

18    of each tour and shall detail with as much specificity

19    as possible how the State is or is not in compliance

20    with particular provisions of the Consent Judgment.

21    Drafts of the Monitor's reports shall be provided to

22    the Parties for comment at least ten (10) business days

23    prior to issuance of the reports. Upon the achievement

24    of eighteen (18) months of substantial compliance with

25    any substantive paragraph(s) of this Agreement, no

26    further reporting shall be required on that paragraph.

27

28

86

1      7.    The Defendants shall notify the Monitor immediately
2            upon the death of any current State Hospital patient,
3            including any person who died following transfer due to
4            medical condition from a State Hospital to another
5            medical facility.   The Defendants shall forward to the
6            Monitor copies of any completed incident reports
7            related to deaths, autopsies and/or death summaries of
8            residents, as well as all final reports of
9            investigations that involve State Hospital patients.
10           The Defendants shall also notify the Monitor
11           immediately if they receive a citation or threat to
12           de-certify a State Hospital from the Centers for
13           Medicaid and Medicare Services.
14  E.   The United States' Access to Information and the State
15       Hospitals
16      1.    The United States shall have full access to, and shall,
17           upon request, receive copies of any documents, records,
18           databases, and information relating to the
19           implementation of this Consent Judgment.   The
20           Defendants shall provide any requested documents,
21           records, databases, and information to the United
22           States as soon as possible, but no later than within
23           thirty (30) business days of the request, or within a
24           time frame negotiated by the parties if the volume of
25           requested material is too great to reasonably produce
26           within thirty days.   The United States, upon reasonable
27           notice, shall have full access to all of the State
28           Hospitals' buildings and facilities, staff, patients,

87

1               patients' records, documentation, and information

2               relating to the issues addressed in this Consent

3               Judgment.  The State Hospitals' Executive Directors

4               shall direct all employees to cooperate fully with the

5               United States.  The United States may receive and

6               respond to unsolicited calls or contacts from State

7               personnel outside the presence of State

8               representatives.

9                     **PART III**

10                **MODIFICATION OF TERMS**

11 A.   If the Parties reach a subsequent agreement that varies from

12 the Plan, the new agreement shall be reduced to writing, signed,

13 and filed with the Court for approval.

14                     **PART IV**

15             **COMPLIANCE AND TERMINATION**

16 A.   The purpose of this Consent Judgment is that the Defendants

17 will be able to achieve desired outcomes for and provide the

18 necessary protections, supports, and services to the

19 individuals served by the State Hospitals. All of the terms of

20 the Plan set forth in Part I hereof shall be implemented at the

21 State Hospitals within 36 months of the Enhancement Plan's

22 effective date, except that § I.3 of the Plan and all provisions

23 of the Plan having to do with suicide prevention measures shall

24 be implemented at the State Hospitals upon the effective date of

25 this Consent Judgment.  This Consent Judgment will be terminated

26 and the case dismissed five (5) years after the effective date of

27 the Consent Judgment.  This Consent Judgment may terminate at an

28 earlier date if the Parties agree that the Defendants are in

88

1  substantial compliance with each provision of the Consent
2  Judgment, and the State has maintained compliance for at least
3  eighteen (18) months ("maintained sustained compliance").   If
4  Defendants and the Monitor contend that the Defendants have
5  maintained sustained compliance and the United States disagrees,
6  Defendants may move this Court for an order terminating this
7  Consent Judgment.   In any instance in which the parties disagree
8  as to compliance, the Court shall give appropriate deference to
9  the Monitor's assessment of compliance.   Noncompliance with mere
10 technicalities, or temporary failure to comply during a period of
11 otherwise sustained compliance shall not constitute failure to
12 maintain substantial compliance.   At the same time, temporary
13 compliance during a period of sustained noncompliance shall not
14 constitute substantial compliance.

15 B.   At all times, the State shall comply with applicable federal
16 and state licensing requirements.

17 C.   If the United States maintains that the Defendants have
18 failed to carry out any requirement of this Consent Judgment, the
19 United States shall notify the Defendants with specificity of any
20 instance(s) in which it maintains that the Defendants have failed
21 to carry out the requirements of this Consent Judgment.

22 D.   With the exception of conditions or practices that pose an
23 immediate and serious threat to the life, health, or safety of
24 individuals served by the State Hospitals, the Defendants shall
25 have thirty (30) days from the date of a deficiency notice from
26 the United States to cure the claim of noncompliance.   During
27 this period, the Parties shall coordinate and shall discuss areas
28 of disagreement and attempt to resolve outstanding differences.

89

1 E.    Unless specified to the contrary elsewhere herein, in any
2 compliance or other adversarial hearing prior to final dismissal
3 of this action, the burden of proof will be on the Party moving
4 the Court.

5 F.    All provisions of this Consent Judgment shall have ongoing
6 effect until the final dismissal of this action.  The Court shall
7 retain jurisdiction for all purposes until such time as this
8 action dismissed.  Independent of the foregoing, if the United
9 States and the Defendants agree that the State Hospitals have
10 achieved substantial compliance with each section of this Consent
11 Judgment, the Parties shall file a joint motion to dismiss this
12 action.

13 G.    This case shall be treated administratively as inactive.
14 However, the Court retains jurisdiction to enforce the terms of
15 this Order.

16
17
18 DATED:    This __2__ day of ____May____ , 2006.
19
20
21                          _____
                                 UNITED STATES DISTRICT JUDGE
22
23
24
25
26
27
28

                                    90

1 | APPROVED AS TO FORM AND CONTENT:

2

3

4
WAN J. KIM
5 | Assistant Attorney General

6

7

8 | SHANETTA Y. CUTLAR
Chief, Special Litigation Section
9

10

11
BENJAMIN O. TAYLOE, JR.
12 | LEE R. SELTMAN
MARY R. BOHAN
13 | WILLIAM G. MADDOX
JACQUELINE CUNCANNAN
14 | MATTHEW J. DONNELLY
ANITA C. SNYDER
15 | Trial Attorneys
United States Department of Justice
16 | Civil Rights Division

17

18

19 | DEBRA W. YANG
United States Attorney
20 | LEON W. WEIDMAN
Assistant United States Attorney
21 | Chief, Civil Division
GARY L. PLESSMAN
22 | Assistant United States Attorney
Chief, Civil Fraud Section
23 | HOWARD DANIELS (CA Bar No. 081764)
Assistant United States Attorney
24 |      300 North Los Angeles Street
       Federal Building, Room 7516
25 |      Los Angeles, CA 90012
       (213)894-4024
26

27

28

91

1

2

KIMBERLY BELSHE
3   Secretary, State of California
Health and Human Services Agency
4   State of California
Health and Human Services Agency
5   1600 Ninth Street, Room 460
Sacramento, CA 95814
6

7

8

FRANK S. FURTEK
9   Chief Counsel, State of California
Health and Human Services Agency
10  1600 9th Street, Room 460
Sacramento, CA 95814
11

12

13

14  STEPHEN W. MAYBERG
Director, California Department
15  Of Mental Health
California Department of Mental Health
16  1600 9th Street
Sacramento, CA 95814
17

18

19

CYNTHIA RODRIGUEZ
20  Chief Counsel, California Department of Mental Health
Office of Legal Services
21  California Department of Mental Health
1600 9th Street, Room 153
22  Sacramento, CA 95814

23

24

25

26

27

28

92